# In the United States Court of Federal Claims

No. 04-1441 T

(E-Filed:  July 21, 2009)

_____ )
)
FOUNDATION OF HUMAN )            Judgment on the Administrative
UNDERSTANDING, )            Record; RCFC 52.1; Definition
)            of Church; Revocation of
                              Plaintiff, )            Church Status; I.R.C. §
)            7428(a)(1)(B); Declaratory
v. )            Judgment; I.R.C. § 509(a)(1);
)            I.R.C. § 170(b)(1)(A)(i)
THE UNITED STATES, )
)
                              Defendant. )
)
_____ )

Marc K. Sellers, Portland, OR, for plaintiff.

Michael J. Roney, with whom were John A. DiCicco, Acting Assistant Attorney General,
and Steven I. Frahm, Chief, Court of Federal Claims Section, Tax Division, United States
Department of Justice, Washington, DC, for defendant.  W.C. Rapp, Senior Trial
Attorney, Court of Federal Claims Section, Tax Division, United States Department of
Justice, Washington, DC, of counsel.

OPINION and ORDER

HEWITT, Chief Judge

     Before the court are Plaintiff's Motion for Summary Judgment (plaintiff's Motion
or Pl.'s Mot.), Plaintiff's Memorandum in Support of Its Motion for Summary Judgment
(plaintiff's Memorandum or Pl.'s Mem.), the Cross-Motion of the United States for
Summary Judgment and Brief in Support Thereof and in Opposition to Plaintiff's Motion
for Summary Judgment (defendant's Motion or Def.'s Mot.), Plaintiff's Reply in
Opposition to Defendant's Cross Motion for Summary Judgment, and in Support of
Plaintiff's Motion for Summary Judgment (plaintiff's Reply or Pl.'s Reply), defendant's

Reply for the United States in Support of Its Cross Motion for Summary Judgment and in Opposition to Plaintiff's Motion for Summary Judgment (defendant's Reply or Def.'s Reply), the Supplementary Brief of the United States on the Questions of Jurisdiction, Evidence, and Exhaustion of Administrative Remedies, Pursuant to the Order of April 9, 2009 (defendant's Supplemental Brief or Def.'s Supp. Br.), and Plaintiff's Supplemental Brief on Issues Raised by the Court (plaintiff's Supplemental Brief or Pl.'s Supp. Br.). Also before the court is the administrative record (Admin. Rec.), which was filed on October 23, 2006, and supplemented on September 25, 2008.

For the following reasons, plaintiff's Motion is DENIED, and defendant's Motion is GRANTED.[1]

I.      Background

---

[1] Upon reviewing the parties' briefing and possibly applicable rules, the court has concluded that it would be most appropriate to issue its decision in this action pursuant to Rule 52.1 of the Rules of the United States Court of Federal Claims (RCFC), which provides for judgments based on the administrative record "[w]hen proceedings before an agency are relevant to a decision in a case" before the court.  RCFC 52.1(a).  Accordingly, the court treats the parties' Motions as "Motions for Judgment on the Administrative Record" pursuant to RCFC 52.1(c). RCFC 52.1(c).

In Plaintiff's Motion for Reconsideration of [the] Court's Order to Recharacterize Cross Motions for Summary Judgment RCFC 52 (plaintiff's Motion for Reconsideration or Pl.'s Recons. Mot.), plaintiff raises concerns regarding the standard of review applied in cases previously decided in the United States Court of Federal Claims pursuant to RCFC 52.1.  Pl.'s Recons. Mot. ¶ 10.  However, plaintiff correctly notes that those cases were governed by standards established under "the [Administrative Procedure Act (APA)] or similar statutes," and are therefore distinguishable from the present case, which is governed by the court's declaratory judgment jurisdiction pursuant to I.R.C. § 7428 (2006).  Pl.'s Recons. Mot. ¶ 12.  The court therefore does not perceive that a judgment under RCFC 52.1 affects the outcome the case. Under both RCFC 52.1 and RCFC 56, the standards of review and burdens of proof and persuasion are set by the terms of the applicable substantive law, which in this action comprises both statutory and case law.  See RCFC 52.1 Rules Comm. Note (2006) ("The standards and criteria governing the court's review of agency decisions vary depending upon the specific law to be applied in particular cases."); see also Anderson v. Liberty Lobby, Inc. (Anderson), 477 U.S. 242, 248 (1986) ("As to materiality, the substantive law will identify which facts are material. Only disputes over facts that might affect the outcome of the suit under the governing law will properly preclude summary judgment.").

Accordingly, plaintiff's Motion for Reconsideration is DENIED.

A.      Identity of Plaintiff

Plaintiff, Foundation of Human Understanding (Foundation), is a California nonprofit corporation incorporated on June 17, 1963.  Admin. Rec. 461; Plaintiff's Proposed Findings of Uncontroverted Fact (RCFC 56(h)) (plaintiff's Facts or Pl.'s Facts) ¶ 1; see Defendant's Response to Plaintiff's Proposed Findings of Uncontroverted Fact (defendant's Response to plaintiff's Facts or Def.'s Resp. to Pl.'s Facts) 7 (stating no substantive objection to Pl.'s Facts ¶ 1).  "Plaintiff's founder, and its [p]resident from its date of incorporation to the present, is Roy Masters."  Joint Stipulation of Facts, Dkt. No. 47, filed May 23, 2008 (Joint Stip.) ¶ 2 (citing Admin. Rec. 26).  "Since 1961[,] Roy Masters has been teaching his Judeo-Christian beliefs in the United States."  Joint. Stip. ¶ 3 (citing Admin. Rec. 26, 7071).

Plaintiff's Articles of Incorporation state that plaintiff's "specific and primary purposes are the promulgation of the religious, charitable, scientific, literary and educational aspects of mind over matter and spiritual health known as psychocatalysis."  Admin. Rec. 462.  "Roy Masters has developed a particular form of meditation that is used by his followers."  Pl.'s Mem. 6; Admin. Rec. 6390-6460 (Technical Advice Pre-Submission Conference Material) 51 ("[Foundation's] form of worship is self meditation").

B.      Procedural History

"The Internal Revenue Service [(IRS)] formally recognized plaintiff's tax-exempt status as an organization described in the Internal Revenue Code [(Code or I.R.C.)] § 501(c)(3) on December 20, 1965."  Defendant's Proposed Findings of Facts (defendant's Facts or Def.'s Facts) ¶ 4; Plaintiff's Response to Defendant's Proposed Findings of Facts (plaintiff's Response to defendant's Facts or Pl.'s Resp. to Def.'s Facts) 5; Admin. Rec. 456.  "On August 17, 1970, plaintiff filed with the IRS a Form 4653, 'Notification Concerning Foundation Status,' indicating that it was not a private foundation because it was a church under I.R.C. § 170(b)(1)(A)(i) and an organization described in I.R.C. § 509(a)([1])."  Def.'s Facts ¶ 4; Pl.'s Resp. to Def.'s Facts 5.  On October 20, 1970, the IRS issued a determination that plaintiff was not a private foundation under I.R.C. § 509(a) because it was a publicly supported organization under I.R.C. § 170(b)(1)(a)([vi]).  Joint Stip. ¶ 7 (citing Admin. Rec. 28); see also Def.'s Facts ¶ 4; Pl.'s Resp. to Def.'s Facts 5.  "In or before 1979, [plaintiff] again requested a ruling from the IRS that it was a church."  Def.'s Facts ¶ 5; Pl.'s Resp. to Def.'s Facts 5.  In response to this request, the IRS issued an adverse determination letter on March 13, 1980 denying plaintiff's application to have its exemption classification modified to that of a church under I.R.C. §§ 509(a)(1) and 170(b)(1)(A)(i).  Joint Stip. ¶ 10 (citing Admin. Rec. 29-30); see also

Def.'s Facts ¶ 5; Pl.'s Resp. to Def.'s Facts 5.  After plaintiff filed a protest, defendant issued a final adverse determination letter on February 23, 1982 stating that while plaintiff was a religious and educational organization, it did not qualify as a church.  Joint Stip. ¶ 12 (citing Admin. Rec. 30); Def.'s Facts ¶ 5; Pl.'s Resp. to Def.'s Facts 5.  Subsequently, plaintiff brought suit in the United States Tax Court (Tax Court) seeking a declaratory judgment that it qualified as a church under I.R.C. § 170(b)(1)(A)(i).  Def.'s Facts ¶ 5; Pl.'s Resp. to Def.'s Facts 5-6; Joint Stip. ¶ 13 (citing Admin. Rec. 38).  In 1987, addressing plaintiff's operations for periods before 1983, the Tax Court held that plaintiff qualified as a church under I.R.C. § 170(b)(1)(A)(i).  Joint Stip. ¶ 18 (citing Admin. Rec. 53); Def.'s Facts ¶ 6; Pl.'s Resp. to Def.'s Facts 6; Found. of Human Understanding v. Comm'r (Foundation I), 88 T.C. 1341, 1360 (1987).  Following the issuance of the Tax Court's opinion, the IRS "issued a revised determination letter on January 29, 1988, maintaining [p]laintiff's section 501(c)(3) status and confirming [plaintiff's] status as a church under [s]ections 509(a)(1) and 170(b)(1)(A)[(i)], effective August 1, 1979."  Joint Stip. ¶ 19; Admin. Rec. 1861.

In a letter dated October 16, 2001, the IRS notified plaintiff that it was commencing a church tax inquiry to resolve questions concerning plaintiff's continued qualification as a church under  § 170(b)(1)(A)(i).  Def.'s Facts ¶ 17; Pl.'s Resp. to Def.'s Facts 14; Admin. Rec. 1.  Plaintiff responded on November 21, 2001.  Def.'s Facts ¶ 17; Pl.'s Resp. to Def.'s Facts 14; Admin. Rec. 228.  On December 21, 2001, the IRS sent plaintiff a Notice of Church Tax Examination.  Def.'s Facts ¶ 17; Pl.'s Resp. to Def.'s Facts 14; Admin. Rec. 314.  The church tax examination concluded with defendant's issuance of a Technical Advice Memorandum dated June 8, 2004.  Def.'s Facts ¶ 4[2]; Pl.'s Resp. to Def.'s Facts 34; Admin. Rec. 8798-824 (IRS National Office Technical Advice Memorandum) (Technical Advice Memorandum).  The Technical Advice Memorandum included defendant's conclusion that plaintiff's status as a tax-exempt organization under § 501(c)(3) should not be revoked, but that plaintiff no longer qualified as a church under § 170(b)(1)(A)(i).  Def.'s Facts ¶ 4[2]; Pl.'s Resp. to Def.'s Facts 34; Technical Advice Memorandum 27.  Defendant's revocation of plaintiff's church status was retroactive in its effect to January 1, 1998.  Technical Advice Memorandum 27.

Plaintiff instituted the current action on September 13, 2004, to dispute defendant's revocation of its church status.  Plaintiff's Complaint (Compl.) passim.  Plaintiff contends that it is entitled to a declaratory judgment pursuant to § 7428 that it qualifies as a church under § 170(b)(1)(A)(i) as a matter of law.  Pl.'s Mem. 2.  Defendant maintains that, as a matter of law, plaintiff cannot prove that it meets the critical factors necessary to qualify as a church under § 170(b)(1)(A)(i), and therefore cannot sustain its burden of proving that defendant erroneously revoked its status as a non private

4

foundation under I.R.C. § 509(a)(1).  Def.'s Mot. 1, 44.  Because the court determined that portions of the parties' arguments warranted further discussion, the court heard oral argument on the parties' Motions on May 27, 2009.  See Transcript of May 27, 2009 Oral Argument (Tr.).

The sole issue before the court is whether plaintiff qualifies as a church described in § 170(b)(1)(A)(i).[2]  Pl.'s Mem. 1; Def.'s Mot. 4.

II.     Jurisdiction

A.      The Statutory Scheme:  I.R.C. § 7428(a), I.R.C. § 501(c)(3), I.R.C. § 509(a), and I.R.C. § 170(b)(1)(A)(i)-(vi)

Section 7428(a) of the Code vests the United States Court of Federal Claims with jurisdiction to grant relief in cases of actual controversy involving the revocation of a taxpayer's tax-exempt classification.  I.R.C. § 7428 (2006).  "[T]he statute's primary purpose is to provide nonprofit organizations claiming tax-exempt or non-private foundation status with an avenue for prompt judicial relief from erroneous or arbitrary determinations by the Internal Revenue Service."  Friends of the Soc'y of Servants of God v. Comm'r (Friends), 75 T.C. 209, 215 (1980).

Section 7428(a) provides that in the case of an actual controversy involving a determination by the Secretary of the Treasury "with respect to the initial classification or continuing classification of an organization as a private foundation (as defined in section 509(a))," I.R.C. § 7428(a)(1)(B), the United States Court of Federal Claims "may make a

---

[2] Here, as in American Guidance Foundation, Inc. v. United States (American Guidance), plaintiff's tax-exempt status under the Internal Revenue Code (Code or I.R.C.) § 501(c)(3) is not at issue.  Plaintiff's Memorandum in Support of Its Motion for Summary Judgment (plaintiff's Memorandum or Pl.'s Mem.) 13 ("[Defendant] concluded that [plaintiff] is a publicly-supported charity, exempt from taxation as an organization described in 26 U.S.C. § 501(c)(3)."); Cross-Motion of the United States for Summary Judgment and Brief in Support Thereof and in Opposition to Plaintiff's Motion for Summary Judgment (defendant's Motion or Def.'s Mot.) 5 ("The Commissioner of Internal Revenue has ruled that [p]laintiff is a religious organization described in I.R.C. § 501(c)(3)"); Am. Guidance, 490 F. Supp. 304, 306 (D.D.C. 1980) (stating that the taxpayer's 501(c)(3) tax-exempt status and 509(a)(1) status were not at issue); cf. Church By Mail, Inc. v. Comm'r, 765 F.2d 1387, 1390, 1390 n.1 (9th Cir. 1985) (upholding United States Tax Court (Tax Court) determination that plaintiff did not qualify as a tax-exempt organization under § 501(c)(3) and therefore not reaching the question whether plaintiff was a church for purposes of § 170(b)(1)(A)(i)).

declaration with respect to such initial qualification or continuing qualification," I.R.C. § 7428(a).[3]  Section 7428(a) further states that a "determination" by the Secretary of the Treasury includes "any revocation of or other change in a qualification or classification." Id.

Section 501(c)(3) of the Code allows an exemption from federal income taxes for certain charitable organizations.  I.R.C. § 501(c)(3) (2006).  Section 509(a) of the Code provides that organizations exempt under I.R.C. § 501(c)(3) are private foundations unless the organization fits within certain classes of public charities described in section 509(a)(1)-(4) and thereby qualifies for non private foundation status.  I.R.C. § 509(a) (2006); Church of the Visible Intelligence that Governs the Universe v. United States (Church of the Visible Intelligence), 4 Cl. Ct. 55, 64 (1983) ("Under the statutory scheme, an organization which satisfies the section 501(c)(3) criteria is considered a private foundation unless it establishes that it comes within four specified exceptions.").  Specifically at issue in this case is the provision within § 509(a)(1)[4] affording exemption

---

[3] Section 7428(a) of the I.R.C. establishes this court's declaratory judgment jurisdiction concurrent with the Tax Court and the District Court of the United States for the District of Columbia.  I.R.C. § 7428(a) (2006).

[4] In pertinent part, I.R.C. § 509 provides:

(a) General rule.– For purposes of this title, the term "private foundation" means a domestic or foreign organization described in section 501(c)(3) other than –

(1) an organization described in section 170(b)(1)(A) (other than in clauses (vii) and (viii))[.]

I.R.C. 509(a)(1) (2006).

from private foundation status to organizations described in I.R.C. § 170(b)(1)(A)(i)-(vi).[5]

---

[5] In pertinent part, I.R.C. § 170(b)(1)(A) provides:

(b) Percentage limitations. –

(1) Individuals.– In the case of an individual, the deduction provided in subsection (a) shall be limited as provided in the succeeding subparagraphs.

(A) General rule.– Any charitable contribution to –

(i) a church or a convention or association of churches,

(ii) an educational organization which normally maintains a regular faculty and curriculum and normally has a regularly enrolled body of pupils or students in attendance at the place where its educational activities are regularly carried on,

(iii) an organization the principal purpose or functions of which are the providing of medical or hospital care or medical education or medical research, if the organization is a hospital, or if the organization is a medical research organization directly engaged in the continuous active conduct of medical research in conjunction with a hospital, and during the calendar year in which the contribution is made such organization is committed to spend such contributions for such research before January 1 of the fifth calendar year which begins after the date such contribution is made,

(iv) an organization which normally receives a substantial part of its support (exclusive of income received in the exercise or performance by such organization of its charitable, educational, or other purpose or function constituting the basis for its exemption under section 501(a)) from the United States or any State or political subdivision thereof or from direct or indirect contributions from the general public, and which is organized and operated exclusively to receive, hold, invest, and administer property and to make expenditures to or for the benefit of a college or university which is an organization referred to in clause (ii) of this subparagraph and which is an agency or instrumentality of a State or political subdivision thereof, or which is owned or operated by a State or political subdivision thereof or by an agency or instrumentality of one or more States or political subdivisions,

(v) a governmental unit referred to in subsection (c)(1),

(vi) an organization referred to in subsection (c)(2) which normally receives a substantial part of its support (exclusive of income received in the exercise or performance by such organization of its charitable, educational, or other purpose or function constituting the basis for its exemption under section 501(a)) from a governmental unit referred to in subsection (c)(1) or

(continued...)

B.      Application of the Statutory Scheme

        In order properly to invoke this court's declaratory judgment jurisdiction under I.R.C. § 7428(a), there must exist an "actual controversy."  I.R.C. § 7428(a).  An actual controversy exists when the taxpayer has received an adverse ruling from the IRS.  CREATE v. Comm'r (CREATE), 634 F.2d 803, 812-13 (5th Cir. 1981); Baptist Hosps., Inc. v. United States (Baptist Hospitals), 851 F.2d 1397, 1400 (Fed. Cir. 1988) (adopting the reasoning of the United States Court of Appeals for the Fifth Circuit in CREATE, and stating that "the denial or revocation of tax exempt status, or other negative determination under § 7428(a)(1), creates an actual controversy"); McLennan v. United States (McLennan), 23 Cl. Ct. 99, 103 (1991) ("For an 'actual controversy' to exist, there must be an IRS decision which directly affects an organization's 'classification or qualification' for tax exempt treatment.").  While the definition of an adverse ruling has been the subject of debate in prior cases,[6] it is now accepted that "the receipt of a favorable ruling on a non-private status that is a different and less advantageous status" than the one sought by the taxpayer qualifies as an adverse determination sufficient to meet the "actual controversy" requirement of I.R.C. § 7428(a).  CREATE, 634 F.2d at 813 (approving of and adopting the reasoning of the Tax Court in Friends); Friends, 75 T.C. at 217 (holding that the court had jurisdiction over the matter because the IRS's ruling was adverse in many respects, including the fact that defendant's ruling "impose[d] terms on petitioner's foundation status which would not have been imposed upon a church"); see Baptist Hospitals, 851 F.2d at 1400 (agreeing with the reasoning of the United States Court of Appeals for the Fifth Circuit in CREATE); Peter H. Winslow, T.M.P. 885-2nd: Exempt Organizations – Declaratory Judgments (Exempt Organizations) at IV(E)(5)(a) (2008) ("Where an organization receives a favorable determination letter

---

        [5](...continued)
from direct or indirect contributions from the general public . . . .

I.R.C. § 170(b)(1)(A) (2006).

        [6] In Foundation of Human Understanding v. Comm'r (Foundation I), for example, the majority opinion found that the actual controversy requirement was met.  Foundation I, 88 T.C. 1341, 1355 (1987).  The dissent, however, stated that plaintiff's classification as a publicly supported charity under § 170(b)(1)(A)(vi), instead of as a church under § 170(b)(1)(A)(i), was not sufficient to establish the actual controversy requirement of § 7428 because plaintiff retained its non private foundation status under § 509(a)(1) despite the revocation by the Internal Revenue Service (IRS) of plaintiff's church status.  Foundation I, 88 T.C. at 1384 (Williams, J., dissenting).

on foundation status under a paragraph or subdivision of § 509(a) or § 170(b)(1)(a) other than to which it argues it is entitled[,] . . . [t]he IRS treats such a ruling as an adverse determination and informs the organization of its rights under § 7428.").[7]  Upon

---

[7] In its Supplementary Brief of the United States on the Questions of Jurisdiction, Evidence, and Exhaustion of Administrative Remedies, Pursuant to the Order of April 9, 2009 (defendant's Supplemental Brief or Def.'s Supp. Br.), defendant opposes this court's jurisdiction over plaintiff's action, contending that the legislative history of § 7428 reveals that Congressional intent was to provide a declaratory judgment remedy only for "controversies that place in question the deductibility of charitable contributions."  Def.'s Supp. Br. 13.  However, the United States Court of Appeals for the Federal Circuit (Federal Circuit) has stated that this court's § 7428 declaratory judgment power is not to be narrowly construed so as to only apply in situations where an organization is in immediate danger of losing contributions.  See Baptist Hosps., Inc. v. United States (Baptist Hospitals), 851 F.2d 1397, 1399 (Fed. Cir. 1988) ("Section 7428 was intended to apply where an organization was in immediate danger of losing contributions, but we do not agree that it was 'meant to be narrowly applied to that specific problem.'") (quoting Baptist Hosps., Inc. v. United States, 12 Cl. Ct. 189, 191 (1987), rev'd, 851 F.2d 1397 (Fed. Cir. 1988)).

Defendant also argues that the plain language of § 7428 does not provide jurisdiction over plaintiff's action.  Def.'s Supp. Br. 6-8.  The court disagrees.  Section 7428(a) states that "[f]or purposes of this section, a determination with respect to a continuing qualification or continuing classification includes any revocation of or other change in a qualification or classification."  I.R.C. § 7428(a) (emphasis added).  Plaintiff's action is a revocation case, brought subsequent to defendant's revocation of plaintiff's church status under § 170(b)(1)(A)(i).  See supra Part I.B.  The court finds that defendant's revocation resulted in a "change" in plaintiff's "classification" under § 509(a).  See I.R.C. § 509(a).

Defendant urges that the plurality opinion finding jurisdiction in Foundation I not be followed,  Def.'s Supp. Br. 15-33, and also contends that the United States Court of Appeals for the Fifth Circuit (Fifth Circuit) opinion in CREATE v. Commissioner (CREATE), 634 F.2d 803, 813 (5th Cir. 1981), finding that "the receipt of a favorable ruling on a non-private status that is a different and less advantageous status" than the one sought by the taxpayer qualifies as an adverse determination sufficient to meet the "actual controversy" requirement of I.R.C. § 7428(a), should not be relied upon because the CREATE court misconstrues Friends of the Society of the Servants of God v. United States (Friends), 75 T.C. 209 (1980), and because the CREATE court's finding is dicta, Def.'s Supp. Br. 16-20.  In light of the Federal Circuit's opinion in Baptist Hospitals agreeing with the reasoning of the Fifth Circuit in CREATE and the Tax Court in Friends, the court is unpersuaded by defendant's arguments.  See Baptist Hospitals, 851 F.2d at 1400 (agreeing with the Fifth's Circuit's statement that "the denial or revocation of tax exempt status, or other negative determination under section 7428(a)(1), creates an actual

(continued...)

---

[7](...continued)
controversy.") (emphasis added).

Neither party addressed the possible relevance of <u>Baptist Hospitals</u> to the question of jurisdiction in the course of their briefing or oral argument. <u>See</u> Pl.'s Mem. <u>passim</u>; Def.'s Mot. <u>passim</u>. At the conclusion of oral argument, the court ordered the parties to file supplemental briefing addressing the applicability of <u>Baptist Hospitals</u> to plaintiff's action. Order of May 27, 2009. In its Supplemental Brief of the United States on Jurisdiction and <u>Baptist Hospitals</u>, Pursuant to the Order of May 27, 2009 (defendant's Second Supplemental Brief or Def.'s 2d Supp. Br.), defendant argues that <u>Baptist Hospitals</u> is inapplicable to plaintiff's action because <u>Baptist Hospitals</u> dealt with standing for purposes of § 7428(b)(1), whereas the present case implicates jurisdiction for purposes of § 7428(a)(1). Def.'s 2d Supp. Br. 2. Although defendant correctly states that <u>Baptist Hospitals</u> dealt with § 7428(b)(1), § 7428(b)(1) imposes limitations on the jurisdictional grant of § 7428(a), and the court is therefore unpersuaded by defendant's argument that <u>Baptist Hospitals</u> "has no impact" on this court's § 7428(a) jurisdiction, <u>see</u> Def.'s 2d Supp. Br. 1.

While <u>Baptist Hospitals</u> dealt primarily with the limitation contained within § 7428(b)(1) regarding standing to bring declaratory judgment actions under § 7428(a), it also dealt with the government's contention in that case that there was no "actual controversy" as required by the language of § 7428(a). <u>Baptist Hospitals</u>, 851 F.2d at 1400. The Federal Circuit endorsed the approach taken in <u>Friends</u> and <u>CREATE</u> for purposes of analyzing the actual controversy requirement of section 7428(a). <u>See</u> <u>id.</u> (agreeing with the Fifth's Circuit's statement that "the denial or revocation of tax exempt status, <u>or other negative determination</u> under section 7428(a)(1), creates an actual controversy.") (emphasis added). The court thinks it unlikely that the Federal Circuit would rely upon <u>Friends</u> or <u>CREATE</u> if it had any question as to the correctness of those decisions. The court disagrees with defendant's contention that <u>Baptist Hospitals</u> "offers nothing" on the question of jurisdiction pursuant to section 7428(a). <u>See</u> Def.'s 2d Supp. Br. 2.

Defendant also argues that the Federal Circuit's discussion of the actual controversy requirement of 7428(a) is inapplicable in this case because it applies only to the first of two prongs of a jurisdictional analysis. Def.'s 2d Supp. Br. 5. However, defendant's argument suffers from its mischaracterization of the Federal Circuit's jurisdictional analysis as a two-step process, beginning with an initial test regarding the presence of an actual controversy, followed by a second step determining "whether that controversy falls under one of the jurisdictional grants of section 7428(a)(1)." <u>Id.</u> It appears to the court that both <u>Baptist Hospitals</u>, and the <u>Friends</u> decision upon which the Federal Circuit relies in <u>Baptist Hospitals</u>, engage in a single analysis of whether defendant's actions are sufficiently adverse to meet the "actual controversy" requirement contained within the language of section 7428(a) as a prerequisite to establishing declaratory judgment jurisdiction. <u>See</u> <u>Baptist Hospitals</u>, 851 F.2d at 1400; <u>Friends</u>, 75 T.C. at

(continued...)

defendant's revocation of plaintiff's church status, the IRS informed plaintiff of its right to bring a declaratory judgment action under I.R.C. § 7428.  Def.'s Supp. Br. Exhibit (Ex.) A (IRS Letter to Plaintiff dated September 12, 2004) 2 ("If you decide to contest this determination in court, you must initiate a suit of declaratory judgment in the United States Tax Court, the United States Claims Court or the District Court of the United States for the District of Columbia . . . .").

Plaintiff seeks a declaration by this court that it qualifies as a church following defendant's determination that plaintiff no longer qualified as a "church" under I.R.C. § 170(b)(1)(A)(i), and defendant's subsequent revocation of plaintiff's church classification.  Compl. 1.  Defendant's revocation is a determination made by the Secretary "with respect to the . . . continuing classification of an organization as a private foundation (as defined in section 509(a))."  See I.R.C. § 7428(a)(1)(B).  Although plaintiff remains classified as a non private foundation under § 509(a)(1) as a publicly supported charity under § 170(b)(1)(A)(vi), that classification is a different and less advantageous status than the § 509(a)(1) status which plaintiff previously held and presently seeks.  See Exempt Organizations at IV(E)(5)(a) (discussing the fact that status as a church is more advantageous than as a publicly supported charity because, for example, "a church receives preferential treatment under the [Internal Revenue] Code (principally [because of] the exemption from filing annual information returns . . . and the restriction on audits of churches"); Spiritual Outreach Soc'y v. Comm'r (Spiritual Outreach II), 927 F.2d 335, 337 n.2 (8th Cir. 1991) ("[T]here are additional tax benefits which inure to an organization if it is determined to be a church.  These benefits include exemption from certain excise taxes and, perhaps most importantly, exemption from annual information filings."); Church of Spiritual Tech. v. United States (Church of Spiritual Technology), 26 Cl. Ct. 713, 731 n.37 (1992) (describing the advantages of being defined as a church for the purpose of the tax laws and stating that "churches may be investigated by the IRS only in accordance with strict and specific procedures"), aff'd 991 F.2d 812 (Fed. Cir. 1993) (Table).  Therefore, an actual controversy exists in this case following the IRS's final adverse determination revoking plaintiff's status as a non private foundation under § 509(a)(1) based upon its church classification under § 170(b)(1)(A)(i).  Cf. McLennan, 23 Cl. Ct. at 103 (finding no actual controversy where defendant had not revoked plaintiff's tax-exempt status).

---

[7](...continued)
215-17.  To the extent that defendant contends that both Baptist Hospitals and Friends use the term "actual controversy" as synonymous with a "dispute" between the parties, the court disagrees with defendant's reading of both cases.

Section 7428(b) also requires that the taxpayer exhaust all administrative remedies available to it within the IRS before this court's authority can properly be exercised. I.R.C. § 7428(b)(2); <u>St. Matthew Publ'g, Inc. v. United States</u> (<u>St. Matthew Publishing</u>), 41 Fed. Cl. 142, 144 (1998) ("[T]he court's authority under section 7428 may not be exercised unless a taxpayer has exhausted all available administrative remedies."). Plaintiff's exhaustion of administrative remedies within the IRS is uncontested by the parties.  <u>See</u> Pl.'s Mem <u>passim</u>; Def.'s Mot. <u>passim</u>; Pl.'s Supp. Br. 4-5; Def.'s Supp. Br. 35.

Because plaintiff meets both jurisdictional prerequisites, this case is properly before this court pursuant to I.R.C. § 7428.

III.    Standards of Review and Scope of Review

A.    Judgment on the Administrative Record

Rule 52.1 of the Rules of the Court of Federal Claims (RCFC) provides for judgment on the administrative record "[w]hen proceedings before an agency are relevant to a decision in a case" before the court.  RCFC 52.1(a).  Cases filed in this court, such as the present action filed by plaintiff, "frequently turn in part on action taken by an administrative agency."  RCFC 52.1 Rules Comm. Note (2006).  "In such cases, the administrative record may provide a factual and procedural predicate for a portion of the court's decision [.] . . ." <u>Id.</u>  RCFC 52.1 applies "whether the court's decision is derived in whole or in part from the agency action reflected in the administrative record." <u>Id.</u> RCFC 52.1 does not address the standards and criteria to be applied in cases decided pursuant to RCFC 52.1 because "[t]he standards and criteria governing the court's review of agency decisions vary depending upon the specific law to be applied in [the] particular case[]." <u>Id.</u>  Accordingly, the standards of review and burdens of proof and persuasion are set by the terms of the applicable substantive law, which in this action comprises both the statutory and case law discussed further below.

To render a decision in this case, the court must determine whether plaintiff is entitled to a declaratory judgment that it qualifies as a church pursuant to § 170(b)(1)(A)(i) as a matter of law.

B.    Declaratory Judgment Actions Pursuant to I.R.C. § 7428(a)(1)(B)

1.    <u>De Novo</u> Review

12

In deciding whether plaintiff is entitled to declaratory judgment, the determination made by the IRS is reviewed de novo by the court in both initial classification and revocation cases.  Exempt Organizations at V(D)(1) (stating that declaratory judgment cases are "reviewed de novo by the court," but noting that "the scope of review in initial qualification and classification cases is limited to the administrative record"); New Dynamics Found. v. United States (New Dynamics), 70 Fed. Cl. 782, 795 (2006).

2.      Burden of Proof on Plaintiff

Courts have recognized that exemptions from tax are matters of "legislative grace," and, accordingly, the burden of establishing entitlement to an exemption is on the taxpayer.  See, e.g., Christian Echoes Nat'l Ministry, Inc. v. United States, 470 F.2d 849, 854 (10th Cir. 1973) (citing Dickinson v. United States, 346 U.S. 389 (1953)); Church of the Visible Intelligence, 4 Cl. Ct. at 65 ("Exemption from taxation as a church is not a right, but a matter of legislative grace.").  An organization's mere declaration that it is a church is insufficient; plaintiff must demonstrate its qualification for tax-exempt status as a church.  Church of the Visible Intelligence, 4 Cl. Ct. at 65.  In revocation cases, the ultimate issue is "'whether the defendant properly revoked the plaintiff's exemption . . . [and] the burden of proof is on plaintiff to establish that such revocation was erroneous." St. Matthew Publishing, 41 Fed. Cl. at 146 (quoting Animal Prot. Inst., Inc. v. United States (Animal Protection), 1978 WL 4201 *6-*7 (Ct. Cl. Trial Div. 1978)); Synanon Church v. United States (Synanon), 557 F. Supp. 1329, 1334 n.6  (D.D.C. 1983) ("In a suit to overturn a determination to revoke exempt status, plaintiff has the burden of proof to establish that revocation was erroneous.") (citing Animal Protection, 1978 WL 4201 at *6-*7).[8]  As in tax refund cases, the standard of review in revocation cases is deferential. St. Matthew Publishing, 41 Fed. Cl. at 145 (a revocation case); New Dynamics, 70 Fed. Cl. at 795 (an initial qualification case in which the court stated, "the prior qualification determination made by the Secretary is entitled to . . . the presumption of correctness ordinarily applicable in tax refund cases, and indeed, the Secretary's formal

_____

[8]  Several declaratory judgment cases discuss the requirement for this court to follow the Tax Court's lead on burden of proof rules in declaratory judgment actions.  See, e.g., New Dynamics Found. v. United States (New Dynamics), 70 Fed. Cl. 782, 799 n.23 (2006) (stating that the legislative history of § 7428 "indicates that 'burden-of-proof rules are to be developed by the courts under their rule-making powers,' [and] . . . that '[i]nsofar as is practical, those rules should conform to the rules that the Tax Court develops with regard to declaratory judgment suits as to retirement plans, under section 7476'" (quoting S. Rep. 94-938(I), at 588) (alterations in original)).  As in New Dynamics, the court need not resolve the extent to which the Tax Court's rules should impact a declaratory judgment proceeding in this court because here, as in New Dynamics, there appears to be no dispute that the burden is on plaintiff to demonstrate that defendant's revocation was erroneous.  New Dynamics, 70 Fed. Cl. at 799 n.23.

interpretations of the statute remain entitled to appropriate deference"). Therefore, "[d]eterminations of the Commissioner [of the IRS] as to tax-exempt status are presumptively correct." St. Matthew Publishing, 41 Fed. Cl. at 145 (a revocation case); see also Church of Spiritual Technology, 26 Cl. Ct. at 729 (analyzing plaintiff's qualification as a religious organization in an initial classification case and stating that "[i]ncome tax exemptions must be strictly construed, with any doubts to be resolved in favor of the taxing entity . . . . [and that] [c]onsequently, determinations of the Commissioner are presumed correct."). The parties agree that, although there exists a presumption of correctness in favor of defendant under St. Matthew Publishing, the applicability of de novo review, coupled with the burden of proof rules applicable in revocation cases such as this, together dictate that if "the party bearing the burden of proof [fails] to carry its burden, . . . the other party will prevail." Pl.'s Supp. Br. 4; Oral Argument of May 27, 2009, Argument of Mr. Michael Roney at 9:49:50;[9] Tr. 35:10-15 (Roney) (agreeing with plaintiff's characterization of the interaction between the presumption of correctness, de novo review, and burdens of proof in revocation cases).

    3.    Supplementation of Administrative Record in Revocation Cases

    The applicable scope of review in revocation cases differs from the scope of review in initial determination cases. See Universal Life Church, Inc. v. United States (Universal Life Church), 13 Cl. Ct. 567, 569 n.1 (1987) (comparing types of evidence acceptable in revocation cases to permissible evidence in initial qualification cases), aff'd 862 F.2d 321 (Fed. Cir. 1988) (Table); Exempt Organizations at V(D)(1)-(2) (same). Specifically, the IRS's determination of a taxpayer's initial qualification for tax-exempt status is based solely upon the administrative record which contains factual assertions made by the taxpayer in its petition for exempt status. Animal Protection, 1978 WL 4201, at *6. Accordingly, the scope of review in initial classification cases brought pursuant to § 7428 is generally limited to the administrative record generated before the IRS.[10] See

---

    [9] The oral argument held on May 27, 2009 was recorded by the court's Electronic Digital Recording system (EDR). All times noted in this Opinion refer to the EDR record of the oral argument.

    [10] Although the scope of review in declaratory judgment actions involving a taxpayer's challenge to an initial determination by the IRS is generally confined to the administrative record, supplementation of the administrative record may be proper when good cause is shown. Peter H. Winslow, T.M.P. 885-2nd: Exempt Organizations – Declaratory Judgments (Exempt Organizations) at V(D)(1)(c) (2008) (discussing the good cause exception for supplementation of the administrative record in initial classification cases); Rule 217(a) of the United States Tax Court Rules of Practice and Procedure (listing good cause exception); Bethel Conservative
                                                                    (continued...)

Universal Life Church, 13 Cl. Ct. at 569 n.1 (comparing types of evidence acceptable in revocation cases to permissible evidence in initial qualification cases); Exempt Organizations at V(D)(1) ("[T]he scope of review in initial qualification and classification cases is limited to the administrative record . . . ."). However, "[i]n a revocation action . . . the [Internal Revenue] Service need not rely on the factual assertions made by the taxpayer in its petition, but may make an independent evaluation of the facts (after an audit)." St. Matthew Publishing, 41 Fed. Cl. at 146 (discussing the applicable scope of review in revocation cases). "[D]isposition on the basis of the administrative record alone will be made only where the parties agree that the record contains all relevant facts and that they are not in dispute." Id. Therefore, "[i]n revocation proceedings before this court under I.R.C. § 7428, the parties may supplement the administrative record." Universal Life Church, 13 Cl. Ct. at 569 n.1 (citing Animal Protection, 1978 WL 4201, at *5). In a revocation action, "the mere fact that items of evidence are contained in the administrative record does not establish the truth of their contents. Admissibility of such evidence for the purpose of establishing the truth of their contents [is] governed by the Federal Rules of Evidence." Animal Protection, 1978 WL 4201, at *7.

4.    Evidence Restricted to Tax Years 1998-2000

The revocation of plaintiff's church status was based on defendant's audit of plaintiff's activities during tax years 1998, 1999, and 2000. Def.'s Supp. Brief 36 ("The period examined by the IRS [was] January 1, 1998 until December 31, 2000."). Following defendant's audit of plaintiff, plaintiff retained its § 501(c)(3) tax-exempt status. Def.'s Supp. Br. Ex. A (IRS Letter to Plaintiff dated September 12, 2004) 1 ("Your tax-exempt status under section 501(c)(3) is not affected."). Although plaintiff retained its non private foundation status under section 509(a)(1), that status was retained because of plaintiff's qualification as a publicly supported charity under § 170(b)(1)(A)(vi), and not as a church under § 170(b)(1)(A)(i). Id. ("We have modified your foundation status to that of a public charity described in sections 509(a)(1) and 170(b)(1)(A)(vi) of the Code."); Def.'s Mot. 5 ("[T]he Commissioner has ruled that [p]laintiff is a publicly supported organization described in 170(b)(1)(A)([vi]. . . .").

---

[10](...continued)

Mennonite Church v. Comm'r, 746 F.2d 388, 392 (7th Cir. 1984) (reviewing a decision by the Tax Court in an initial qualification case and determining that good cause was shown to justify supplementation of the administrative record in a case in which "the question before the Tax Court is one implicating a religion's practices or beliefs").

Case law dictates, and the parties agree, that because defendant's revocation of plaintiff's church status was based on the three years audited by the IRS, this court's declaratory judgment power, and therefore its review of the facts in this case, is limited to plaintiff's activities during the fiscal years 1998, 1999, and 2000.  Def.'s Supp. Br. 37 ("Since the [c]ourt may review only those years under audit, the appropriate scope of evidence is limited to evidence pertaining to those years."); Pl.'s Supp. Br. 3 ("[E]vidence of tax-exempt status should relate to the audit period . . . ."); Oral Argument of May 27, 2009, Argument of Mr. Marc Sellers at 9:15:23-43; Tr. 15:4-8 (Sellers)  ("To the extent that evidence . . . d[oes] not pertain to the tax years in question it would not be relevant to the court's determination [of plaintiff's present declaratory judgment action]."); Oral Argument of May 27, 2009, Argument of Mr. Michael Roney at 9:41:59; Tr. 35:16-18 (Roney) (agreeing with plaintiff's description of scope of relevant evidence).  In Synanon, the plaintiff filed suit in the United States District Court for the District of Columbia following defendant's revocation of the plaintiff's tax-exempt status, seeking a declaratory judgment under § 7428 that the plaintiff qualified as a tax-exempt organization under I.R.C. § 501(a) (2006).  Synanon, 557 F. Supp. at 1330.  The IRS revoked the Synanon plaintiff's tax-exempt status following an audit of the organization's activities during the fiscal years 1977 and 1978.  Id. at 1332.  The plaintiff enjoyed tax-exempt status for all fiscal years prior to the audit.  Id.  When the Synanon plaintiff brought suit for a declaratory judgment regarding its entitlement to tax-exempt status for all years after fiscal year 1976, the court ruled that it lacked subject matter jurisdiction over any years outside the scope of the years which were the subject of defendant's audit.  Id. at 1332-33.  Because the IRS's revocation was not a final and prospective determination, the Synanon court concluded that the plaintiff had not fulfilled the § 7428(b)(2) requirement that a taxpayer exhaust all available administrative remedies before filing suit for declaratory judgment in the district court.  Id.  Explaining that "each tax year constitutes a separate cause of action," the court held that the defendant's determination did not "eliminat[e] any requirement for plaintiff to seek further administrative relief.  Rather, it shift[ed] to plaintiff the burden of taking further action to restore its exempt status."  Id.

Here, as in Synanon, if plaintiff believes that it should be declared exempt for any tax years subsequent to those which formed the subject of defendant's audit, "it should petition for exempt status for those years.  Until plaintiff so applies, the [Internal Revenue] Service cannot make a determination with respect to those years.  Absent a determination, there is nothing for the [c]ourt to review."[11]  See id. (citation omitted).

---

[11] Plaintiff argued in briefing that activities outside the scope of the tax years at issue should be reviewed by the court.  Pl.'s Mem. 3.  Plaintiff did not support its argument with case

(continued...)

5.      Plaintiff's Qualification for Church Status Under I.R.C. § 170(b)(1)(A)(i) Is
        the Sole Issue Before the Court

a.      The Court's Review Does Not Judge Plaintiff's Religious Beliefs

The sole issue before the court is whether plaintiff qualifies as a church described
in § 170(b)(1)(A)(i).  See supra Part I.B.  Several courts have acknowledged the possible
First Amendment concerns that may arise when determining a taxpayer's qualification as
a "church" under § 170.  In Church of the Visible Intelligence, the United States Claims
Court stated that the lack of Congressional guidance in providing a ready distinction
between the term "church" and the term "religious organization" for purposes of
interpreting the Code was likely due to First Amendment concerns.  Church of the Visible
Intelligence, 4 Cl. Ct. at 64.  In Foundation I, the Tax Court cautioned against unduly
expanding a court's scope of inquiry when making a declaration regarding a taxpayer's
classification as a church, stating, "We must recognize that one person's prophet is
another's pariah.  Consequently, we must also assiduously avoid expanding our inquiry
into the merits of petitioner's beliefs or risk running afoul of First Amendment religious
protections."  Foundation I, 88 T.C. at 1357 (citations omitted).

Foundation, like the plaintiff in American Guidance Foundation, Inc. v. United
States (American Guidance), holds benefits derived from its status as a tax-exempt
organization under §§ 501(c)(3) and 509(a) which "are not in jeopardy."  See American
Guidance, 490 F. Supp. 304, 306 (D.D.C. 1980).  Here, as in American Guidance,
defendant agrees that plaintiff is a religious organization.  Def.'s Mot. 5 ("The
Commissioner of Internal Revenue has ruled that [p]laintiff is a religious organization
described in I.R.C. § 501(c)(3) . . . .");  see American Guidance, 490 F. Supp. at 306.
Therefore, "[d]ifficult issues involving what constitutes sincere religious belief or
practice, and how to avoid enforcing religious orthodoxy through the tax laws need not be

---

[11](...continued)
law, but instead rested its argument on one sentence in a treatise.  Pl.'s Mem. 3 (quoting Exempt
Organizations at V(D)(2) ("[Despite the holding in Synanon Church v. United States (Synanon),
557 F. Supp. 1329 (D.D.C. 1983)], the courts should consider any evidence concerning current
operations presented by the organization to the IRS and included in the administrative record,
even though this evidence does not relate to the years under audit.")).  The court understands
plaintiff's position in briefing to have been abandoned by plaintiff's concession at oral argument.
See Oral Argument of May 27, 2009, Argument of Mr. Marc Sellers at 9:15:23-43; Tr. 15:4-8
(Sellers) ("To the extent that evidence . . . d[oes] not pertain to the tax years in question it would
not be relevant to the court's determination [of plaintiff's present declaratory judgment action].").

faced." American Guidance, 490 F. Supp. at 306; see also Chapman v. Comm'r (Chapman), 48 T.C. 358, 361 (1967) (deciding whether taxpayer organization qualified as a church, educational organization, or hospital within § 170(b)(1)(A)(i)-(iii) and stating that "we are not here concerned with the question as to what constitutes a 'religion' within the purview of the first amendment of the Constitution"). Here, as in Spiritual Outreach II, the court can make a declaration as to plaintiff's church status based on a review of plaintiff's activities without judging the sincerity of plaintiff's religious beliefs. See Spiritual Outreach II, 927 F.2d 335, 339 (8th Cir. 1991) (holding that plaintiff was not a church for federal tax purposes even though "there [wa]s no doubt that [plaintiff] [wa]s engaged in sincere religious activity"); Universal Life Church, 13 Cl. Ct. at 580 (reviewing IRS's revocation of plaintiff's 501(c)(3) status and stating, "It is not within the court's purview to judge in this motion the legitimacy of plaintiff's religion.  However, it is legitimate for the court to review plaintiff's [tax-exempt] status").

The court is not here called upon to determine constitutional questions, nor is it called upon to determine the "philosophical, theological, or ecclesiastical refinements" of the term "church."  See Chapman, 48 T.C. at 368 (Tannenwald, J., concurring).  Instead, the court here deals with a much narrower issue:  plaintiff's qualification as a "church," as the term is understood for the purpose of determining tax-exempt status under the Code.

b.      The Court Does Not Reach the Constitutionality of Defendant's Action

Plaintiff makes vague allegations in its briefing regarding the constitutionality of defendant's criteria for determining qualification of a taxpayer for church status under § 170(b)(1)(A)(i) and the application of those criteria to plaintiff.  See, e.g., Pl.'s Mem. 18-19.  Plaintiff's statements of concern appear, as defendant suggests, to be criticisms of defendant's examination of various factual elements customarily considered when determining church status, rather than criticisms of the exemption given to churches.  See id.  Of course, an attack on the exemption itself would, if successful, eliminate the category within which plaintiff seeks to be classified.  Def.'s Reply 2 n.1.

While the government "may constitutionally tax the income of religious organizations [and] may decide not to exercise this power and grant reasonable exemptions to qualifying organizations while continuing to tax those who fail to meet these qualifications," The Ecclesiastical Order of the ISM of AM, Inc. v. Comm'r (Ecclesiastical Order), 80 T.C. 833, 841-42 (1983) (citing Parker v. Comm'r, 365 F.2d 792, 795 (8th Cir. 1966)), unconstitutional discrimination may nevertheless arise "if benefits granted to one religious group are denied to others of essentially the same class," id. at 842.

18

In this case, plaintiff's First Amendment concerns are stated in a conclusory fashion, and not fully briefed by either party.  See Pl.'s Mem. passim; Def.'s Mot. passim; Pl.'s Reply passim; see also Hernandez v. Comm'r, 490 U.S. 680, 695 (1989) (holding that the charitable contribution provisions of I.R.C. § 170 (2006) did not violate the First Amendment's establishment and free exercise clauses after establishing the applicable analytical framework for such claims which includes an "initial inquiry [into] whether the law facially differentiates among religions [and] if no such facial preference exists, . . . [an application of] the customary three-pronged Establishment Clause inquiry derived from Lemon v. Kurtzman, 403 U.S. 602, . . . (1971)").  Constitutional jurisprudence dictates that a court refrain from deciding a constitutional issue that, as in this case, is not squarely before the court.  See, e.g., Oil, Chem. & Atomic Workers Int'l Union v. Missouri, 361 U.S. 363, 370 (1960) ("'Constitutional questions are not to be dealt with abstractly'. . . . They will not be anticipated but will be dealt with only as they are appropriately raised upon a record before us.") (quoting Allen-Bradley Local v. Wis. Board, 315 U.S. 740, 746 (1942)); Kessler v. Comm'r (Kessler), 87 T.C. 1285, 1293-94 (1986) (discussing a taxpayer's claims that § 170 is unconstitutional and stating "We will not guess at claims of unconstitutionality.  It is a serious business to consider whether the Nation's legislature has violated the Constitution under which it is established and under which it acts.").  The court, therefore, regards plaintiff's conclusory and glancing First Amendment arguments as outside the scope of this opinion.  See Kessler, 87 T.C. at 1294 (refusing to decide constitutional issues "unless they are properly presented and must be decided in order to determine whether petitioners [are entitled to the relief requested]"); cf. United States v. Holmes, 614 F.2d 985, 989 (5th Cir. 1980) (noting that "ordinarily [a court] should refrain from constitutional adjudication where statutory interpretation or application will suffice," but going on to provide a "constitutional compass" in part because the constitutional issues had been fully briefed by the parties).

Having established that plaintiff's constitutional concerns are not squarely before the court here, the court notes that it is, and believes it should be, uncomfortable with the criteria used by the IRS for determination of the church status of religious organizations. See generally, Tr. 42:8-47:17 (colloquy between the court and defendant about the definition of church and the Establishment Clause).

In its 2008 U.S. Religious Landscape Survey (Survey), the Pew Forum on Religion and Public Life found that "religious affiliation in the U.S. is both very diverse and extremely fluid."  The Pew Forum On Religion and Public Life, U.S. Religious Landscape Survey 5 (Feb. 25, 2008), available at http://religions.pewforum.org/pdf/report-religious-landscape-study-full.pdf (last visited June 22, 2009).  The Survey includes a brief history of the role of religion in the United States Census.  Id. at 108.  The Survey states that census takers in the United States began

asking questions about religious organizations in 1850.  Id.  Subsequent to the
establishment of the U.S. Census Bureau in 1902 and the statutory creation of the Census
of Religious Bodies as a stand-alone census in 1906, the first Census of Religious Bodies
asked many of the same questions as earlier censuses.  Id.  These questions included "year
the congregations were established; . . . number of ministers and their salaries; number of
congregation-operated schools, teachers, scholars and officers; and demographic
characteristics of congregation members."  Id.  "The ultimate demise [of the Census of
Religious Bodies] in 1956 stemmed in part from a growing public debate over the
propriety, merit and feasibility of the Census Bureau asking questions about religion."  Id.
at 109.  Those who opposed questions on religion voiced concerns about "the protection
of religious liberty and privacy rights, and whether the government was overstepping the
constitutional boundaries separating church and state."  Id.

     The criteria used by the IRS to determine church status for tax purposes, see infra
Part IV.A.2, bear a striking similarity to the topics of the questions contained in the 1906
Census of Religious Bodies.  This resemblance strongly suggests that defendant's criteria
are time-conditioned and reflect institutional characteristics that no longer capture the
variety of American religions and religious institutions in the twenty-first century.  The
regime appears to favor some forms of religious expression over others in a manner in
which, if not inconsistent with the letter of the Constitution, the court finds troubling
when considered in light of the constitutional protections of the Establishment and Free
Exercise Clauses.

IV.   Discussion

     A.    Applicable Tests

     Several courts have recognized that "there is very little guidance for courts to use
in making decisions [as to church status]."  Spiritual Outreach II, 927 F.2d at 338
(describing the determination of a taxpayer's church status as a "difficult procedure" and
stating that "deciding what constitutes a church for federal tax purposes is not an easy
task"); Church of the Visible Intelligence, 4 Cl. Ct. at 64 ("While federal tax authorities
must apply the word church in a variety of contexts, there is no ready definition of it.");
see also Bruce R. Hopkins, The Law of Tax-Exempt Organizations § 10.3, at 320 (9th ed.
2007) ("[A] formal and consistent definition of the term church . . . appears incapable of
formulation.") (emphasis in original).

     The United States Supreme Court has discussed the definition of the term "church"
in an opinion involving an exemption from unemployment compensation taxes imposed
by the Federal Unemployment Tax Act (FUTA).  St. Martin Evangelical Lutheran Church

v. South Dakota (St. Martin), 451 U.S. 772, 780-85 (1981).  Although the Court held that, for purposes of § 3309(b) of the FUTA, the term "must be construed to refer to the congregation or the hierarchy itself, that is, the church authorities," id. at 784, the Court also expressly "disavow[ed] any intimations in this case defining or limiting what constitutes a church under FUTA or under any other provision of the Internal Revenue Code," id. at 784 n.15.

"The Internal Revenue Code is silent as to the definition of the term 'church,' as are the regulations promulgated under section 170." VIA v. Comm'r (VIA), 68 T.C.M. (CCH) 212, 215 (1994); see also American Guidance, 490 F. Supp. at 306 (discussing the definition of the term "church" and stating "Congress has offered virtually no guidance as to precisely what is meant"); Church of the Visible Intelligence, 4 Cl. Ct. at 64 ("The IRS has followed the lead of Congress and does not define a church in its regulations, either.").

The United States District Court for the District of Columbia examined the definition of the term "church" in a declaratory judgment suit in American Guidance. Despite the fact that almost thirty years have passed since the court's opinion in American Guidance, it remains true that "a coherent definition [of the term does not] emerge from reviewing . . . the limited instances of judicial treatment."  American Guidance, 490 F. Supp. at 306.  Although there remains no formal definition of the term "church" for federal tax purposes, it is well established that Congress intended the definition of a "church" to be more restrictive than the definition of a "religious organization" within the United States Tax Code.  Id.; Church of Spiritual Technology, 26 Cl. Ct. at 731. Therefore, "[a]lthough every church may be a religious organization, not every religious organization is a church."  Foundation I, 88 T.C. at 1356 (citing Chapman v. Comm'r (Chapman), 48 T.C. 358, 363 (1967)).

In the absence of Congressional guidance and without any guidance from within the regulations themselves, courts have developed at least three different approaches to determine whether a taxpayer qualifies as a "church" for purposes of section 170(b)(1)(A)(i).  See VIA, 68 T.C.M. (CCH) at 215 ("Without a definitive response from Congress or the Treasury Department as to the definition of a church, our task is to decide the issue on a case-by-case basis.").

1.      The De La Salle Approach

In De La Salle Institute v. United States (De La Salle), the United States District Court for the Northern District of California heard a suit brought by an organization contending that it was exempt from taxation imposed upon its unrelated business income

due to its qualification as a church under I.R.C. § 511(a)(2)(A).  De La Salle, 195 F. Supp. 891, 898 (N.D. Cal. 1961).  The court in De La Salle concluded that in the absence of a Congressional definition of the term "church," the term is properly defined by "the common meaning and usage of the word."  Id. at 903.  In decisions subsequent to De La Salle, courts have declined to adopt the approach taken by the De La Salle court.  See, e.g., Foundation I, 88 T.C. at 1356 ("Given the plurality of religious beliefs in this country, the validity of [the De La Salle] approach is not without doubt."); Spiritual Outreach II, 927 F.2d at 339 n.6 (declining to comment on the validity of the De La Salle approach); Lutheran Social Serv. of Minn. v. United States (Lutheran Social Service), 758 F.2d 1283, 1287 n.4 (8th Cir. 1985) (refusing to express an opinion on the approach taken in De La Salle and noting that the Supreme Court has neither endorsed nor rejected the De La Salle approach).  In American Guidance, the court stated that a general or traditional understanding of the term is elusive because "[t]here is no bright line beyond which certain organized activities undertaken for religious purposes coalesce into a 'church' structure[,] . . . [a]nd the range of 'church' structures extant in the United States is enormously diverse and confusing."  American Guidance, 490 F. Supp. at 306 (declining to adopt the De La Salle test).

The court agrees with the reasoning of the cases subsequent to De La Salle, and likewise declines to adopt the De La Salle approach.[12]

2.      The IRS's Fourteen Criteria

Several district courts have applied, without explicitly adopting, a fourteen-criteria standard introduced in 1977 by Jerome Kurtz, then Commissioner of Internal Revenue, and thereafter applied by the IRS to evaluate whether an organization qualifies for church status pursuant to § 170(b)(1)(A)(i).  Bruce R. Hopkins, The Law of Tax-Exempt Organizations § 10.3, at 316-318 (9th ed. 2007) (describing the introduction of the criteria in 1977 and stating, "courts are evidencing acceptance of the IRS criteria."); Pl.'s Mem. 17; Def.'s Mot. 18.  The Tax Court has applied the fourteen criteria in several cases.  See, e.g., First Church of In Theo v. Comm'r (First Church of In Theo), 56 T.C.M. (CCH) 1045, 1049 (1989) (applying the fourteen criteria); Foundation I, 88 T.C. at 1355-61 (same).  The United States District Court for the District of Columbia has also followed suit.  See American Guidance, 490 F. Supp. at 306-07 (applying the fourteen criteria).

_____

[12] In De La Salle Institute v. United States (De La Salle), the court discussed the legislative history of I.R.C. § 170.  De La Salle, 195 F. Supp. 891, 906-07 (N.D. Cal. 1961).  However, that case dealt with a plaintiff's qualification as a church for purposes of I.R.C. § 511(a)(2)(A) (2006), and not with the statutes at issue in this case, §§ 509(a)(1) and 170(b)(1)(A)(i).  See id.

This court has done the same.  See Church of the Visible Intelligence, 4 Cl. Ct. at 64-65 (applying the fourteen criteria).[13]

The United States Court of Appeals for the Eighth Circuit (Eighth Circuit) similarly views the fourteen criteria "as a guide, helpful in deciding what constitutes a church."  Spiritual Outreach II, 927 F.2d at 339; see also Lutheran Social Service, 758 F.2d at 1286 (applying the fourteen criteria to determine church status under § 6033(a)(2)(A)(i) after stating that "[s]ection 6033 does not define the term 'church,' and the Treasury regulations to that section make no attempt to clarify the term").  In United States v. Jeffries (Jeffries), the United States Court of Appeals for the Seventh Circuit (Seventh Circuit) adopted the same approach as the Eighth Circuit.  Jeffries, 854 F.2d 254, 258 (7th Cir. 1988) (considering the fourteen IRS criteria helpful in determining what is a tax-exempt church).

Plaintiff is not required to meet each criterion in order to obtain classification as a church for federal tax purposes.  Spiritual Outreach II, 927 F.2d at 339 ("Each criterion need not be met for an organization to be a church."); Foundation I, 88 T.C. at 1358 ("It is recognized that few traditional churches could meet all of the criteria.  None of the criteria is considered controlling. . . .").  Moreover, here, as in Foundation I, the court views these criteria neither as "exclusive [nor as] mechanically applied, but, rather, [to] serve as a list of some of the characteristics that may be used in determining whether an organization is a church."  Foundation I, 88 T.C. at 1350.  Accordingly, "any other facts and circumstances which may bear upon an organization's claim that it is entitled to church status must also be taken into consideration."[14]  Id.

Here, as in Church of the Visible Intelligence, the court applies the fourteen criteria developed by the IRS and used by this court as a guide in evaluating plaintiff's § 170(b)(1)(A)(i) status.  The fourteen criteria are:

---

[13] Federal district courts have also applied the IRS's fourteen criteria in cases involving claims under statutes other than I.R.C. §§ 509(a)(1) and 170(b)(1)(A)(i).  See, e.g., Goetz v. Greater Ga. Life Ins. Co., 554 F. Supp. 2d 831, 834-37 (E.D. Tenn. 2008) (applying the fourteen criteria in a determination involving the Employee Retirement Income Security Act (ERISA) while acknowledging that the criteria "are not part of ERISA" and stating that "unfortunately, ERISA does not define 'church'").

[14] In plaintiff's Memorandum, plaintiff treats the court's consideration of "any other facts and circumstances," Foundation I, 88 T.C. at 1350, as a fifteenth factor.  Pl.'s Mem. 26.  The court regards plaintiff's arguments in this portion of plaintiff's Memorandum as relevant to the "regular congregation" and "regular religious services" criteria, and therefore addresses plaintiff's arguments in Part IV.B.1.m-n infra.

(1) a distinct legal existence;

(2) a recognized creed and form of worship;

(3) a definite and distinct ecclesiastical government;

(4) a formal code of doctrine and discipline;

(5) a distinct religious history;

(6) a membership not associated with any church or denomination;

(7) an organization of ordained ministers;

(8) ordained ministers selected after completing prescribed studies;

(9) a literature of its own;

(10) established places of worship;

(11) regular congregations;

(12) regular religious services;

(13) Sunday schools for the religious instruction of the young; and

(14) schools for the preparation of its ministers.

Church of the Visible Intelligence, 4 Cl. Ct. at 64-65 (applying the fourteen criteria).

Due partly to concerns over a mechanical application of rigid criteria to a diverse set of religious organizations, some courts have deemed a few of the criteria within the fourteen-factor IRS test to be of special, or "central" importance.  The leading case is American Guidance, in which the United States District Court for the District of Columbia articulated the following standard:

While some of the [fourteen criteria applied by the IRS] are relatively minor, others, e.g.[,] the existence of an established congregation served by an organized ministry, the provision of regular religious services and

religious education for the young, and the dissemination of a doctrinal code, are of central importance.

American Guidance, 490 F. Supp. at 306; see also Foundation I, 88 T.C. at 1357 (adopting and applying the factors deemed most critical in American Guidance); Spiritual Outreach II, 927 F.2d at 339 ("[T]here are certain of the [fourteen] criteria upon which we place a special emphasis.").  In Spiritual Outreach II, the Eighth Circuit explained its approach when stating, "We are mindful of [the plaintiff's] claim that the criteria discriminate unfairly against rural, newly-formed churches which lack the monetary resources held by other churches.  [The plaintiff] is not alone in this position.  In large part it is for this reason we have emphasized what we view as the core requirements of the fourteen criteria."  Spiritual Outreach II, 927 F.2d at 339 (footnote omitted).  The "core requirements" applied in Spiritual Outreach II were first applied by the Eighth Circuit in Lutheran Social Service, where the Eighth Circuit applied the test formulated by the United States District Court for the District of Columbia in American Guidance. See Lutheran Social Service, 758 F.2d at 1287 (adopting the American Guidance test). The Seventh Circuit has also adopted the language of American Guidance.  See Jeffries, 854 F.2d at 258 (same).

The court shares prior courts' concerns over a mechanical application of rigid criteria to a diverse set of religious organizations.  However, it does not appear to the court that any problems resulting from a mechanical application of the fourteen factors are likely to be ameliorated by determining that a lesser number of those factors, "the existence of an established congregation served by an organized ministry, the provision of regular religious services and religious education for the young, and the dissemination of a doctrinal code, are of "central importance."  See American Guidance, 490 F. Supp. at 306.[15]

3.      The Associational Test

---

[15] In the choice of criteria deemed to be of "central importance," it is possible to hear echoes of the concerns which informed the establishment of Protestant institutions in the colonial and early national periods, including the founding of Harvard University, "'to advance Learning and perpetuate it to Posterity; dreading to leave an illiterate Ministry to the Churches[,]'" Samuel Eliot Morison, Three Centuries of Harvard 1636-1936 at 23 (Harvard Univ. Press 1936) (quoting New Englands First Fruits 23 (digitized by Google 2007) (London, printed by R.O. and G.D. for Henry Overton 1643), and the Sunday school movement, see generally Robert W. Lynn and Elliott Wright, The Big Little School:  Two Hundred Years of the Sunday School (Abingdon Press 2d ed., rev. 1980).

Courts have also followed <u>American Guidance</u> in finding that a "church" may be distinguished from other religious organizations by fulfillment of an "associational role:"

>The means by which an avowedly religious purpose is accomplished separates a "church" from other forms of religious enterprise.  At a minimum, a church includes a body of believers or communicants that assembles regularly in order to worship.  Unless the organization is reasonably available to the public in its conduct of worship, its educational instruction, and its promulgation of doctrine, it cannot fulfill this associational role.

<u>American Guidance,</u> 490 F. Supp. at 306 (citation omitted); <u>see also</u> <u>Foundation I</u>, 88 T.C. at 1360 (holding that plaintiff qualified as a church and stating, "Most of the factors considered to be of central importance are satisfied. [Plaintiff] possesses <u>associational aspects</u> that are much more than incidental.") (emphasis added); <u>Spiritual Outreach II</u>, 927 F.2d at 336 (affirming Tax Court's holding that plaintiff "neither fulfilled an <u>associational role</u> nor satisfied the listed requirements used by the IRS to determine church status") (emphasis added); <u>Spiritual Outreach I</u>, 58 T.C.M. (CCH) at 1287 (referring to the "critical associational factor"); <u>Church of Eternal Life and Liberty, Inc. v. Comm'r</u> (<u>Church of Eternal Life</u>), 86 T.C. 916, 924 (1986) ("To qualify as a church, an organization must serve an <u>associational role</u> in accomplishing its religious purposes.") (emphasis added); Def.'s Mot. 6; Pl.'s Mem. 16.

The parties' briefing addresses separately plaintiff's qualification for church status under the fourteen criteria and under the associational standard.  <u>See</u> Def's Mot. 42; Pl.'s Mem. 16 (addressing associational test separately from the fourteen criteria); Pl.'s Reply 19 (same).  After a discussion of cases which are readily distinguishable from plaintiff's case, this Opinion addresses the fourteen criteria and the associational standard.

4.      Cases Readily Distinguishable From This Case

There are few cases which could provide guidance to the court on the legal issues presented in this case.  That small number is further reduced by the limited persuasive usefulness of cases in which the fact patterns are readily distinguishable from this case.

First, this case is easily distinguishable from cases in which church status has been denied to organizations serving primarily secular functions.  In one case, plaintiff, Junaluska Assembly Housing, Inc., was formed by the United Methodist Church as a separate corporation.  <u>Junaluska Assembly Housing, Inc. v. Comm'r</u> (<u>Junaluska</u>), 86 T.C. 1114, 1117 (1986).  Plaintiff's principal purpose was "to contract for the construction of

temporary and permanent housing." Id.  Therefore, despite its close relationship with and service to a religious organization with church status, plaintiff in that case did not qualify as a church in its own right.  Id. at 1127.  Similarly, in Chapman, the plaintiff seeking declaratory judgment was Missionary Dentist, a religious and charitable organization whose "underlying function . . . [was] to preach the Gospel around the world, using dentistry as a means by which to contact people."  Chapman, 48 T.C. at 360.[16]  While providing dental health care for communities in foreign countries, plaintiff's members conducted religious services and established small indigenous churches in the countries in which they visited.  Id. at 360.  The court denied plaintiff church status, stating that "petitioner cannot escape the fact that . . . a large part of the efforts of the Missionary Dentist was the furnishing of dental service, . . . and that its other activities, though considered important, were nevertheless accessorial."  Chapman, 48 T.C. at 368 (Tannenwald, J., concurring).

In Lutheran Social Service, the plaintiff provided services including child care and adoption services, various counseling services, and residential treatment services to individuals within a variety of segments of its community, irrespective of the individuals' religious beliefs.  Lutheran Social Service, 758 F.2d at 1285.  Plaintiff's members were not required to counsel with any particular religious orientation when providing services. Id. at 1287.  When viewed in light of the fourteen criteria, the court concluded that plaintiff in that case was "a social service agency and it could not become a church . . . merely by being affiliated with a church."[17]  Id. ("Such services are secular in nature when performed by secular organizations, and cannot be transformed into 'ministrations of sacerdotal functions' merely because they are performed by a religiously affiliated social service organization like [plaintiff].").

Plaintiff in this case, however, cannot be properly analogized to either the social services agency in Lutheran Social Service, nor can it be accurately described as an organization serving primarily secular functions such as the contracting services provided

---

[16] The majority opinion in Chapman v. Commissioner (Chapman) defines the term church as synonymous with the concepts of "denomination" or "sect."  Chapman, 48 T.C. 358, 363 (1967).  The parties do not advocate, and the court does not find, strong support in case law for the position taken by the majority in Chapman.  See Pl.'s Mem. passim; Def.'s Mot. passim.  The court follows the approach taken in the concurring opinion in Chapman.

[17] In Lutheran Social Service of Minnesota v. United States (Lutheran Social Service), the United States Court of Appeals for the Eighth Circuit applied the fourteen criteria to determine church status under § 6033(a)(2)(A)(i) after observing, "Section 6033 does not define the term 'church,' and the Treasury regulations to that section make no attempt to clarify the term." Lutheran Social Service, 758 F.2d at 1286 (8th Cir. 1985).

by the plaintiff in <u>Junaluska</u> and the dentistry services provided by plaintiff in <u>Chapman</u>. The record makes clear that plaintiff serves a religious purpose. <u>See infra</u> Part IV.B.1.n at n.23 (discussing plaintiff's status as a religious organization and describing its form of worship).

Second, plaintiff in this case presents a more robust institutional record than did individuals seeking declaratory judgments in cases where the courts characterized litigants as either individual or single-family private religious enterprises. In <u>Jeffries</u>, the Seventh Circuit held that an individual's "effort to create his one-person church" in that case did not qualify as a church in light of the fourteen IRS criteria. <u>Jeffries</u>, 854 F.2d at 258 ("[N]o matter the sincerity of his religious beliefs or the abundance of his religious contributions, [defendant] does not satisfy the tax code's reasonable criteria in whole or in part."). In <u>Richardson v. Commissioner</u> (<u>Richardson</u>), petitioner argued summarily that "because he believe[d] in the Bible, he qualifie[d] as a church." <u>Richardson</u>, 70 T.C.M. (CCH) 14, 16 (1995). The court held that one individual's declaration that he was a church was insufficient to gain church status. <u>Id.</u> ("A church cannot, for [f]ederal income tax purposes, consist of just one individual."). The court in <u>American Guidance</u> held that a family practicing their religion in their own home was not a church within the meaning of § 170. <u>American Guidance</u>, 490 F. Supp. at 306. Throughout its existence, the <u>American Guidance</u> plaintiff's membership was comprised of its founder and, at most, five members of his immediate family. <u>Id.</u> at 305. The religious worship of the plaintiff in <u>American Guidance</u> did not extend beyond the family's home. <u>Id.</u> at 307. Following an analysis of plaintiff's failure to meet several of the fourteen criteria, the court concluded that "plaintiff is engaged in a quintessentially private religious enterprise." <u>Id.</u> In a similar case, this court denied church status in a case in which plaintiff satisfied few of the fourteen criteria, had a membership of only three individuals, and where the record was unclear as to whether those three individuals were members of the founder's family. <u>Church of the Visible Intelligence</u>, 4 Cl. Ct. at 65 ("If membership does not extend beyond Rutherford's immediate family, it would appear that plaintiff is engaged in a private religious enterprise, rather than a church.").

The evidence presented in these cases was held to be clearly insufficient to meet the criteria for church status. The facts presented in the record before the court in this case, however, establish that plaintiff's followers include more than a single individual. Def.'s Facts ¶ 41; Pl.'s Resp. to Def.'s Facts 34. The individual adherents extend beyond the founder's immediate family. Def.'s Facts ¶ 41; Pl.'s Resp. to Def.'s Facts 34. Plaintiff's meetings do not take place in a private family home, but rather at Tall Timber Ranch, a private property in Selma, Oregon, which plaintiff purchased in 1979. Def.'s Facts ¶ 16; Pl.'s Resp. to Def.'s Facts 13; Oral Argument of May 27, 2009, Argument of Mr. Marc Sellers at 9:02:16; Tr. 5:4-6 (Sellers) (clarifying that Tall Timber

Ranch is not presently, and has not previously been, the residence of plaintiff's founder, Roy Masters), and 9:25:09; Tr. 22:21-5 (noting that no individual resides at Tall Timber Ranch).

###### B.   Application of the Tests to Plaintiff

Upon an analysis of plaintiff's evidence in light of the fourteen criteria and the assocational test, and exercising as much caution as possible in order to avoid a mechanical application of the fourteen criteria, the court reaches the following conclusions.

###### 1.   The IRS's Fourteen Criteria

###### a.   Independent Legal Existence

It is uncontested that plaintiff has an independent legal existence.  Foundation is a California nonprofit corporation incorporated on June 17, 1963.  Admin. Rec. 461.

###### b.   Recognized Creed and Form of Worship

It is also uncontested that plaintiff has a recognized creed and form of worship. In <u>Foundation I</u>, the Tax Court found that plaintiff's "emphasis on emotional self-control through a specific type of meditation as the key to salvation sets [plaintiff] apart from other recognized religions."  <u>Foundation I</u>, 88 T.C. at 1359.  Defendant "does not challenge [p]laintiff's assertion that this finding satisfies this criterion" for the purposes of the present case.  Def.'s Mot. 21.

###### c.   Membership Not Associated With Any Other Church or Denomination

Plaintiff concedes that it does not have a membership unassociated with any other church or denomination.  Pl.'s Reply 12 ("Defendant correctly states that plaintiff has no formal membership.  Nor does [p]laintiff require that its congregants abandon affiliations with other churches or faiths.").  Plaintiff does not require its followers to reject membership in other churches.  <u>See</u> Pl.'s Mem. 7.  Plaintiff has "thousands of Foundation adherents or followers who practice the meditation techniques, attend seminars, read the Foundation publications, including approximately 2,000 in the Grants Pass, Selma, Medford Area of [Oregon]."  Def.'s Facts ¶ 41; Pl.'s Resp. to Def.'s Facts 34.  However, despite having adherents or followers, plaintiff has no formal membership.  Pl.'s Facts ¶ 9; Def.'s Resp. to Pl.'s Facts 13; <u>see also</u> Def.'s Facts ¶ 41; Pl.'s Resp. to Def.'s Facts 34 ("The Foundation does not have members per se.").

d.      Distinct Religious History

Plaintiff's evidence is sufficient to demonstrate its distinct religious history.  At the time of the Foundation I decision, plaintiff already had "a distinct, if relatively short, religious history."  Foundation I, 88 T.C. at 1359.  "Spread[ing] one's religious beliefs is, undeniably, an integral part of many faiths."  Id. at 1360.  Plaintiff has made known its religious beliefs since its inception, and uses a variety of vehicles to disseminate its religious beliefs, including radio broadcasts and written publications.  Joint. Stip. ¶¶ 26-7, 29.  Plaintiff offers "phone-based religious counseling."  Def.'s Facts ¶ 12; Pl.'s Resp. to Def.'s Facts 11.  For a period of time prior to the Foundation I decision, Brighton Academy – an independent school formed by plaintiff's founder, but now unaffiliated with plaintiff – included religious instruction as part of its curriculum.  See Def.'s Facts ¶ 24; Pl.'s Resp. to Def.'s Facts 19.  Plaintiff has "thousands of Foundation adherents or followers who practice the meditation techniques, attend seminars, read the Foundation publications, including approximately 2,000 in the Grants Pass, Selma, Medford Area of Oregon."  Def.'s Facts ¶ 41; Pl.'s Resp. to Def.'s Facts 34.  Plaintiff has submitted evidence in the form of correspondence from its followers which establishes that plaintiff has a group of adherents who feel an affiliation with plaintiff and its message.  See infra Part IV.B.1.m.  Moreover, entities independent of Foundation also disseminate Roy Masters's teachings in Great Britain and Tanzania.  Def.'s Facts ¶ 25; Pl.'s Resp. to Def.'s Facts 21.

e.      Literature of Its Own

The administrative record reflects that plaintiff has a literature of its own.  Plaintiff maintains an internet website at http://www.fhu.com/.  Def.'s Facts ¶ 7; Pl.'s Resp. to Def.'s Facts 7.  On its website, plaintiff sells materials authored by Roy Masters.  Def.'s Facts ¶ 10; Pl.'s Resp. to Def.'s Facts 9.  Among its offerings are "Sex Without Sin 1 & 2," "Overcoming Overeating," "Dealing Properly with Children," "How to Survive Your Wife & Mother," and How to Conquer Negative Emotions.  Def.'s Facts ¶ 10; Pl.'s Resp. to Def.'s Facts 9-10.  Plaintiff's offerings in audio format include "Love and Marriage," "Health and Addiction," "Family & Parenting," and "Christmas Special - Collector's Videos."  Def.'s Facts ¶ 10; Pl.'s Resp. to Def.'s Facts 9-10.  Plaintiff publishes a monthly newsletter, New Insights, which includes articles written by its founder, Roy Masters.  Def.'s Facts ¶ 11; Pl.'s Resp. to Def.'s Facts 10.  New Insights has a paid subscription list of 898 and is distributed free of charge to another 172 individuals.  Def.'s Facts ¶ 11; Pl.'s Resp. to Def.'s Facts 10.  Defendant's contention that plaintiff's literature is not "substantial" enough to qualify as a distinct religious literature is unpersuasive.  See Def.'s Reply 13.

f.      Established Place of Worship

Plaintiff has demonstrated that it has an established place of worship.  Plaintiff's
current headquarters is Tall Timber Ranch, a property in Selma, Oregon, which plaintiff
purchased in 1979.  See Def.'s Facts ¶ 16; Pl.'s Resp. to Def.'s Facts 13.  During the
meetings which take place at Tall Timber Ranch, "Foundation ministers conduct
personal counseling; instruction in meditation techniques and self-awareness and
otherwise present and discuss the . . . teachings of the Foundation."  See Pl.'s Facts ¶ 13;
Def.'s Resp. to Pl.'s Facts 15.[18]  Defendant contends that plaintiff does not meet this
criterion, placing the weight of its argument on the fact that plaintiff sold two of the
buildings it owned at the time of the decision in Foundation I.  See Def.'s Reply 14-15.
In 1982, plaintiff purchased a Seventh Day Adventist church building in Grants Pass,
Oregon, which plaintiff used as a location for its activities.  Def.'s Facts ¶ 13; Pl.'s Resp.
to Def.'s Facts 12.  Plaintiff put this building on the market in 1991 and sold it in 1994.
Def.'s Facts ¶ 13; Pl.'s Resp. to Def.'s Facts 12.  The parties agree that as of the time of
the tax court decision in Foundation I, plaintiff owned a building in Los Angeles,
California.  See Def.'s Facts ¶ 15; Pl.'s Resp. to Def.'s Facts 13.  Plaintiff held services
which were open to the public three to four times a week at its Los Angeles, California
location.  Def.'s Facts ¶ 15; Pl.'s Resp. to Def.'s Facts 13.  Plaintiff sold the Los
Angeles, California building sometime in or before 1994.  See Def.'s Facts ¶ 15; Pl.'s
Resp. to Def.'s Facts 13.  Plaintiff has not purchased any additional buildings for
worship since that time.  Def.'s Facts ¶ 13; Pl.'s Resp. to Def.'s Facts 12.

The court does not find defendant's argument persuasive.  The case law does not
dictate, nor does the court find, that a religious organization must have various places in
which it conducts its activities in order to satisfy this criterion.  Defendant also takes
issue with the fact that plaintiff has not cited any evidence of the frequency of worship at
this location.  Def.'s Mot. 33 n.23.  However, the frequency of worship at a particular
location is not a consideration in the court's determination of this factor.  See, e.g.,
Spiritual Outreach I, 58 T.C.M. (CCH) at 1287 (discussing the factors that militated in
favor of the plaintiff in that case, including the fact that plaintiff had "a building used for

---

[18] Defendant objects to plaintiff's use of the phrase "otherwise present and discuss,"
contesting that it is vague.  See Defendant's Response to Plaintiff's Proposed Findings of
Uncontroverted Fact (defendant's Response to plaintiff's Facts or Def.'s Resp. to Pl.'s Facts) 15.
The court does not perceive the basis for defendant's objection.  "[P]resent[ing]" and
"discuss[ing]" are well understood to refer to specific activities.  If defendant's objection is to the
term "otherwise," it is clear from the titles of plaintiff's publications that there are many subjects
that could be addressed.

meditation and prayer"). For the foregoing reasons, the court finds that Tall Timber Ranch is plaintiff's place of worship.

g.      Definite and Distinct Ecclesiastical Government

Plaintiff has presented evidence sufficient to establish that it has a definite and distinct ecclesiastical government. Plaintiff contends that it satisfies this requirement because its "board of directors and ministry have directed its operations from its inception." Pl.'s Mem. 20. Plaintiff further states that because the evidence shows that "[p]laintiff's affairs are governed by its [b]oard of [d]irectors . . . [which is] comprised of individuals including its ministers and its Founder," plaintiff satisfies this criterion. Pl.'s Supp. Br. 5-6. While plaintiff correctly states that case law does not "suggest any threshold governmental structure that would satisfy [this criterion]," Pl.'s Mem. 20, case law does provide that an ecclesiastical government is responsible for religious or doctrinal decisions. See Foundation I, 88 T.C. at 1359. While the portion of the record to which plaintiff points as evidence of this criterion, Pl.'s Supp. Br. 5, is not especially probative of the issue, see Admin. Rec. 690 (a board of directors resolution authorizing plaintiff's founder, Roy Masters, to determine legal validity of marriage contracts used by plaintiff in marriages it performs), other record evidence shows that plaintiff's board of directors is in fact made up of its ministers and founder. See Admin. Rec. 693-94 (Consent to Action taken by plaintiff's board of directors and signed by plaintiff's ministers in their capacity as directors). The corporate form of organization is definite and distinct and the court sees no reason to challenge plaintiff's assertion that the board of directors directs Foundation's operations. The founder and acknowledged spiritual leader is both a board member and the corporation's president, and it is clear that the doctrinal leadership emanates from the corporation, and, especially, the corporation's chief executive officer.

h.      Formal Code of Doctrine and Discipline

Plaintiff has demonstrated that it satisfies this criterion. The IRS's church tax inquiry letter of October 16, 2001, asked the following question of Foundation: "Do you impose a formal code of doctrine upon your members? If so, is there any form of discipline (spiritual or otherwise) employed? Explain in detail." Def.'s Facts ¶ 41; Pl.'s Resp. to Def.'s Facts 33. Plaintiff's response to the IRS, sent November 21, 2001, was the following:

The form of discipline which the Foundation teaches is an individual discipline in the meditative practices taught by Roy Masters, including understanding the true relationship of men and women toward God and

32

toward each other and in their society.  It is fundamental to the discipline
as taught by the Foundation and Roy Masters that individuals overcome
their own emotional impulses and societal influences, to take control of
their lives through meditative practices and self-discipline.  Those who fail
to do so are at risk of both consciously and unconsciously being controlled
by the forces of evil and society.  This code of doctrine and discipline is set
forth in detail in the writings of Roy Masters which are disseminated by the
Foundation.

Def.'s Facts ¶ 41; Pl.'s Resp. to Def.'s Facts 34.  Plaintiff also attached a statement of
belief written by its founder, Roy Masters, as proof that Foundation meets this
requirement.  Admin. Rec. 7081-85.  While plaintiff has not provided any evidence
demonstrating its formal adoption of the doctrine or discipline described in either its
response to the defendant's inquiry letter or in Roy Masters's statement, the court does
not find that omission dispositive.  The teachings of Roy Masters focus on an
individual's ability to "take control of [his life] through . . . self-discipline . . . [in order
to avoid] being controlled by the forces of evil and society."  Def.'s Facts ¶ 41; Pl.'s
Resp. to Def.'s Facts 34.  One would not expect to find a doctrine such as plaintiff's –
which emphasizes "self-discipline" –  to be vindicated by external means.  The
"discipline" is the "risk of both consciously and unconsciously being controlled by the
forces of evil."  Def.'s Facts ¶ 41; Pl.'s Resp. to Def.'s Facts 34.  The dissemination of
plaintiff's beliefs through the writings of its founder are sufficiently formal to meet this
requirement.

i.      Organization of Ordained Ministers

The parties agree that during the tax years 1998 through 2000, the following
members of the Masters family were ordained ministers of Foundation:  Roy Masters,
Ann Masters, David Masters, Dianne Masters Linderman, David Linderman, Elizabeth
Diane Linderman, and Michael Masters.  Def.'s Facts ¶ 22; Pl.'s Resp. to Def.'s Facts
17.  The administrative record contains Certificates of Ordination issued by plaintiff.
Admin. Rec. 2796-2801.  Plaintiff's Certificates of Ordination are signed by Roy
Masters as president and Ann Masters as secretary.  Def.'s Facts ¶ 22; Pl.'s Resp. to
Def.'s Facts 17.  Roy Masters's own Certificate of Ordination is signed by the following
members of plaintiff's board:  David Masters, Dianne Masters, Michael Masters, Lee
Wendelbo, and David Negron.  Def.'s Facts ¶ 22; Pl.'s Resp. to Def.'s Facts 18.  The
record also demonstrates that the following individuals were ordained ministers at the
time of the church tax inquiry:  Albert Munoz, Mel Colton, Joel Moskowitz, Gene
Takamine, Steven Kefalianos, Lee Wendelbo, Robert L. Dennis, Steven Stillwell, and
Delores Allmond.  Pl.'s Reply Exhibit (Ex.) 1 (Supplemental Affidavit of Roy Masters)

at 16251-57, 16259 (Certificates of Ordination).  Plaintiff has demonstrated that it has an organization of ordained ministers.  Cf. Spiritual Outreach II, 927 F.2d at 339 (finding that plaintiff failed to satisfy the organized ministry criteria, and stating, "[i]t appears that every minister who was involved in a function . . . was a guest minister from another church").

j.      Schools for the Preparation of its Ministers

Plaintiff does not have schools for the preparation of its ministers.  See Pl.'s Mem. passim.

k.      Ministers Selected After Completing Prescribed Courses of Study

Plaintiff has adequately demonstrated that its ministers are selected after completing prescribed courses of study.  The parties agree that the ordination process consists of a personal tutelage under plaintiff's founder, Roy Masters.  See Def.'s Facts ¶ 21; Pl.'s Resp. to Def.'s Facts 16.  "There is no 'set curriculum' that sets out guidelines for the tutelage, and there is no set length of time [for the tutelage]."  Def.'s Facts ¶ 21; Pl.'s Resp. to Def.'s Facts 17.  A minister is ordained once Roy Masters is "'personally satisfied' that the individual understands and can explain the doctrines of [Foundation] at a level that allows [the individual] to adequately represent the Foundation."  Def.'s Facts ¶ 21; Pl.'s Resp. to Def.'s Facts 17.  As a result, the tutelage can range from between a few months to several years of study.  Def.'s Facts ¶ 21; Pl.'s Resp. to Def.'s Facts 17.  In short, plaintiff relies on Roy Masters's subjective assessment regarding an individual's qualification for ordination.  While the facts here are unlike those in Foundation I, where the Tax Court found that Foundation's ministers were ordained only after having completed a three-year apprenticeship under the tutelage of plaintiff's founder, Foundation I, 88 T.C. at 1348,  the court disagrees with defendant's view that, in the absence of a clear path of study, plaintiff does not meet this factor.  See Def.'s Reply 13.  Defendant's argument reflects an image of a learned – often degreed – clergy that is familiar in some, but by no means all, religious traditions.

l.      Religious Instruction for the Young

Plaintiff does not provide sufficient evidence to prove that it provides religious instruction for the young, whether through a church school or otherwise.  See Pl.'s Mem. passim.  Plaintiff does not provide a school for the religious training of the young.  Pl.'s Mem. 12.  Plaintiff contends that it meets this factor due to its relationship with Brighton Academy, and the religious nature of the education taught at Brighton Academy.  See Pl.'s Mem. 11, 26.  However, record evidence supports the opposite conclusion.

34

Roy Masters and Foundation founded Brighton Academy, a school for children, in 1977.  Def.'s Facts ¶ 24; Pl.'s Resp. to Def.'s Facts 19.  The parties agree that Brighton Academy was separately incorporated in 1991, and is currently a legal entity separate from Foundation.  See Def.'s Facts ¶ 24; Pl.'s Resp. to Def.'s Facts 19-20.  Brighton Academy maintains an internet website at http://www.brightacademy.org/.  Def.'s Facts ¶ 7; Pl.'s Resp. to Def.'s Facts 7.  At its founding, Brighton Academy's classwork included religious instruction based on plaintiff's beliefs.  Def.'s Facts ¶ 24; Pl.'s Resp. to Def.'s Facts 19.  The school's current religious statement, however, does not mention Foundation or Roy Masters.  Def.'s Facts ¶ 24; Pl.'s Resp. to Def.'s Facts 20.  The religious statement, contained on its website, states in relevant part:

> Brighton Academy is a non-denominational Judeo-Christian school.  We do not teach any specific religion and we firmly believe that it is the family's responsibility to establish and maintain it's [sic] own religious belief system.

Def.'s Facts ¶ 24 (alteration in original); Pl.'s Resp. to Def.'s Facts 20.  Plaintiff has not provided any evidence to show that the religious curriculum taught at Brighton Academy reflects Foundation's practices or beliefs.  See Pl.'s Mem. passim; Pl.'s Reply passim.  In fact, plaintiff has not submitted any materials evidencing the school's religious curriculum.  See Pl.'s Mem. passim; Pl.'s Reply passim.  Moreover, the school's religious statement does not espouse the beliefs of Foundation or Roy Masters.  See Admin. Rec. 7263 (Religious Statement of Brighton Academy).  Instead, the statement states that Brighton Academy "do[es] not teach any specific religion."  Id.  Plaintiff does not maintain a legal relationship with Brighton Academy.  Admin. Rec. 7079 (plaintiff's statement that "Brighton Academy incorporated itself in 1991").  Although defendant does not contest that plaintiff's founder, Roy Masters, is a member of Brighton Academy's board of directors, see Def.'s Mot. passim; Def.'s Facts ¶ 24, this, without more, is insufficient to establish that plaintiff meets this criterion.  There is simply no evidence before the court to support the conclusion that plaintiff provides religious instruction for the young at Brighton Academy.

m.      Regular Congregation

Plaintiff relies heavily on evidence that is either irrelevant or inadmissible hearsay in its attempt to prove that it meets this criterion.  The portion of plaintiff's preferred evidence which can be properly reviewed by the court is insufficient to establish plaintiff's satisfaction of this factor.

Plaintiff cites to and appears to rely on the portion of the opinion in <u>Foundation I</u> in which the Tax Court found that plaintiff held regular services of regular congregations consisting of 50 to 350 persons at its Los Angeles, California, and Grants Pass, Oregon headquarters.  Pl.'s Mem. 24 (citing <u>Foundation I</u>, 88 T.C. at 1359).  The facts before the Tax Court in 1987 are irrelevant to the court's present determination regarding plaintiff's activities subsequent to the <u>Foundation I</u> decision.  Moreover, plaintiff does not offer any evidence that its activities are substantially the same as they were at the time of the <u>Foundation I</u> decision.  <u>See</u> Pl.'s Mem. <u>passim</u>; Pl.'s Reply <u>passim</u>.  Plaintiff sold the Grants Pass, Oregon church building in 1994.  Def.'s Facts ¶ 13; Pl.'s Resp. to Def.'s Facts 12.  Plaintiff also sold the Los Angeles, California building sometime in or before 1994.  <u>See</u> Def.'s Facts ¶ 15; Pl.'s Resp. to Def.'s Facts 13.  Plaintiff has not purchased any buildings since that time.  Def.'s Facts ¶ 13; Pl.'s Resp. to Def.'s Facts 12.

Plaintiff offers no evidence regarding the regularity, if any, with which the 50 to 350 congregants referred to in <u>Foundation I</u>, or any other established group of congregants, continued to practice together during the period of 1998 through 2000.  <u>See</u> Pl.'s Mem. <u>passim</u>; Pl.'s Reply <u>passim</u>. On the contrary, the record makes clear that between 1998 and 2000, plaintiff offered only twenty-one seminars at a variety of locations, five of which were in Oregon.  Def.'s Facts ¶ 27; Pl.'s Resp. to Def.'s Facts 22.  The record also establishes that during the period of 1998-2000, Roy Masters experienced poor health, Def.'s Facts ¶ 26; Pl.'s Resp. to Def.'s Facts 21, and that, during this time, Sunday meetings became less frequent.  Def.'s Facts ¶ 26; Pl.'s Resp. to Def.'s Facts 21.

Plaintiff's responses to defendant's church tax inquiry, although contained within the administrative record, consist of argument rather than fact.  Those statements cannot therefore be marshaled to establish the facts.  Plaintiff has not argued, and the court cannot determine, any exclusion from or exception to the hearsay rule under which these statements can be properly admitted as evidence before the court.  Instead, they are out-of-court statements which plaintiff offers to prove the truth of the matters asserted.  <u>See</u> Fed. R. Evid. 801(c).  The court accordingly regards these statements as inadmissible hearsay, and does not consider plaintiff's arguments for which its only evidence is citation to the inadmissible portions of the administrative record.  <u>See, e.g.</u>, Pl.'s Mem. 24 (citing to a letter sent by plaintiff's counsel to defendant, at Admin. Rec. 229, 231-32, for the proposition that plaintiff held regular meetings in the years subsequent to the Tax Court decision in <u>Foundation I</u>).

Plaintiff relies on statements contained in Roy Masters's affidavit in order to prove that Foundation "continuously" held meetings at Tall Timber Ranch.  <u>See</u> Pl.'s

Mem. 24 (citing Affidavit of Roy Masters ¶¶ 4-5).[19]  However, even assuming that plaintiff's meetings continued to be held at Tall Timber Ranch, this evidence is limited by the fact that it does not demonstrate the regularity, if any, with which congregants assembled together to worship.  Plaintiff's affidavit evidence is too vague to prove that it has a regular congregation.

Plaintiff also relies on letters written by various individuals as "testimonial evidence of plaintiff's congregation."[20]  Masters Affidavit ¶ 19 (referring to letters

---

[19] Defendant argues against the sufficiency of statements contained in Roy Masters's affidavit.  While the court agrees that plaintiff presumably could have marshalled stronger evidence in support of the arguments contained throughout its briefing, the court nevertheless relies on portions of Masters's affidavit in this Opinion which are based on the affiant's personal knowledge, and set forth facts admissible as evidence at trial.  See 11 James Wm. Moore, Moore's Federal Practice (Moore's Federal Practice) § 56.14[1][d], at 56-162.1-163 (3d ed. 2004) ("[A]t the summary judgment stage, the focus is not on the form of the evidence as it is presented in an affidavit, but rather, whether at trial the matter stated in the affidavit would constitute admissible evidence.  To be acceptable at the summary judgment stage, the evidence presented in the affidavit must be evidence that would be admissible if presented at trial through the testimony of the affiant as a sworn witness.").  The court also notes that it does not rely on the portions of Masters's affidavit which the court concludes would be inadmissible at trial for a variety of reasons including statements of legal conclusions, facts which plaintiff has not established are based on the affiant's personal knowledge, and statements that contain conclusory allegations or speculation.  See id. § 56.14[1][d], at 56-164 ("[A]n affidavit that only contains facts that could only be presented at trial through evidence that violates the proscriptions against hearsay and statements made without personal knowledge should not be admitted at the summary judgment stage."); id. § 56.14[1][d], at 56-166.2 ("It is within the court's discretion to strike portions of an affidavit . . . . and to preserve the portions that are competent.").

[20] Defendant argues that the letters to which Roy Masters's affidavit refers are inadmissible.  Def.'s Mot. 25-30.  The court regards the letters as admissible, even though not in the form of affidavits, because the letters can reasonably be converted into admissible evidence at trial through the testimony of their authors.  See 11 Moore's Federal Practice § 56.14[1][d], at 56-164 ("[I]f an affidavit points to the testimony of another witness or source of competent evidence, this may demonstrate the existence of sufficient evidence available at trial to defeat the summary judgment motion") (citing Celotex v. Catrett, 477 U.S. 317, 322-23 (1986) (admitting letter from "work supervisor who stated that plaintiff's decedent was exposed to Celotex's asbestos product" based on the work supervisor's presumed availability as a witness)).  Defendant also argues that the circumstances under which the letters and declarations contained in the administrative record (Admin. Rec.) were submitted to plaintiff raise questions as to their admissibility.  Def.'s Mot. 25-30.  The court notes defendant's objections and takes those

(continued...)

contained in the administrative record at Admin. Rec. 10003-352 and 11349-368); Masters Affidavit ¶ 3 (referring to Admin. Rec. 11213-23, 11246-49, 11256-65)).[21]

The parties agree that plaintiff received approximately 300 letters from prisoners after plaintiff sent a letter to them that was signed by plaintiff's founder, Roy Masters, and dated July 5, 2005.  Def.'s Facts ¶ 36; Pl.'s Resp. to Def.'s Facts 28-30.  Plaintiff enclosed a postage-prepaid business reply mail envelope with the letter.  See Def.'s Facts ¶ 36; Pl.'s Resp. to Def.'s Facts 30.  The mailing read as follows:

> In order to continue serving you with radio programs and materials, we need your help to maintain our 501(c)[(3)] tax-exempt status.
>
> Would you be so kind as to write us a letter briefly explaining the value of the radio programs and the materials you have received?
>
> Please add that you consider us your church, one that you can attend in no other way by reason of your incarceration.

See Def.'s Facts ¶ 36; Pl.'s Resp. to Def.'s Facts 29 (emphasis omitted).  The parties agree that the majority of responses plaintiff received to its mailing indicated that the authors of the responses listened to plaintiff's radio broadcasts.  Def.'s Facts ¶ 36; Pl.'s Resp. to Def.'s Facts 29.  The responses received included the following statements made by the respondents:  "'I consider [Foundation] my church.'"  Def.'s Facts ¶ 37; Pl.'s Resp. to Def.'s Facts 30.  "[Foundation] 'is an organization with the intent of helping people in a non-profit manner.  In other words a church.'"  Id.  "'[Foundation] is the closest to church I can get.'"  Id.  "[Foundation] is 'an alternative to church attendance.'"  Id.

"On or about July 12, 2005, an e-mail message entitled 'Message from Roy' was sent from email@f[h]u.com."  Def.'s Facts ¶ 38; Pl.'s Resp. to Def.'s Facts 31.  "[The e-mail] is addressed 'Hello Friend' and includes a description of how to unsubscribe at the

---

[20](...continued)
objections into consideration in the weight it gives to the evidence, but not as to its admissibility in the summary judgment proceeding.

[21] Plaintiff's citations to portions of the administrative record appear to be in error.  In any case, the court cannot discern how those portions of the record support plaintiff's contention that it has a regular congregation.  See Admin. Rec. 11213-23, 11246-49, 11256-65.  The court takes this opportunity to address all of the portions of the record which contain correspondence from individuals describing their relationship to Foundation.

end of the message." Def.'s Facts ¶ 38; Pl.'s Resp. to Def.'s Facts 31. The message states in its entirety:

> We are grateful for your continued financial support for our worldwide outreach.

> In order to maintain the Foundation's 501(c)[(3)] tax-exempt status (a church) we need your help.

> Would you be so kind as to send us a short letter confirming the value you have received from our radio broadcasts and perhaps our Sunday sessions over the internet?  Please explain why you consider the Foundation your church, one that you perhaps can attend in no other way – distance forbidding.

> In this manner your donations will remain tax-deductible.

> Please write soon.

Def.'s Facts ¶ 38; Pl.'s Resp. to Def.'s Facts 31.  During the two months following the e-mail message, Foundation received 686 emails and letters.  Def.'s Facts ¶ 38; Pl.'s Resp. to Def.'s Facts 32. Over thirty-eight percent of the respondents used postage-prepaid business reply mail envelopes provided by plaintiff for their responses.  Def.'s Facts ¶ 38; Pl.'s Resp. to Def.'s Facts 32.  Twenty-two percent of the respondents replied via email.  Def.'s Facts ¶ 38; Pl.'s Resp. to Def.'s Facts 32.

Responses to the mailing referenced in Def.'s Facts ¶ 38 included the following statement:  "I am writing in reply to the request for 'help to maintain [Foundation's] tax-exempt status.'"  Def.'s Facts ¶ 39; Pl.'s Resp. to Def.'s Facts 33.  "At least [eleven] of the replies specifically mention that they are writing in response to concerns about [Foundation's] 501(c)(3) status."  Id.

Plaintiff has also submitted as evidence declarations that plaintiff prepared which are entitled "Declaration Concerning the Foundation of Human Understanding" and were signed by at least sixty-six people in March 2002.  Def.'s Facts ¶ 34; Pl.'s Resp. to Def.'s Facts 27.  "The pre-printed declarations include, among other things, the statement that Foundation is the signer's 'church' and that [Foundation] has 'sponsored, directed, or conducted sacred or spiritual activities in which I have participated.'"  Def.'s Facts ¶ 34; Pl.'s Resp. to Def.'s Facts 27.  "Below this pre-printed language, each form had a blank space for the signer to fill in 'some of these' activities.  Def.'s Facts ¶ 34;

Pl.'s Resp. to Def.'s Facts 27-28.  "Approximately one-third of signers listed 'services' in the space for indicating their participation in [Foundation], approximately one-third listed seminars or radio broadcasts; another third left it blank."  Def.'s Facts ¶ 34; Pl.'s Resp. to Def.'s Facts 28.

The court views these letters, emails, and declarations as evidence that plaintiff has an established group of followers.  A group of followers, however, is not synonymous with a "regular congregation."  Plaintiff has not adduced evidence that it has formal members.  In fact, plaintiff states that it "has no formal membership" and "does not require that its congregants abandon affiliations with other churches or faiths."  Pl.'s Reply 12.  While a formal membership is not a prerequisite to proving the existence of an established congregation, plaintiff's letters, without more, do not advance plaintiff's argument.  Although the parties agree that plaintiff has "thousands of Foundation adherents or followers who practice the meditation techniques, attend seminars, [and] read the Foundation publications," see Def.'s Facts ¶ 41; Pl.'s Resp. to Def.'s Facts 34 (emphasis omitted), plaintiff has not provided evidence as to the regularity, if any, with which its followers come together to practice.  There is no evidence contained within the letters, emails, declarations, or, for example, in the form of records of attendance, that show a group of followers that regularly congregates in any form – whether virtually or in one another's physical presence.[22]  The absence of this evidence weakens plaintiff's attempt to meet this criterion.  Moreover, there is evidence in the record that Foundation's religious practice neither requires nor promotes associational worship.  Notes from an IRS interview, for example, include the following

_____

[22] Plaintiff has provided records of attendance from some its meetings.  Pl.'s Reply Exhibit (Ex.) 1 (Supplemental Affidavit of Roy Masters) (attaching Admin. Rec. 16002-16230).  This evidence, however, cannot be deployed to prove that plaintiff meets this criterion.  Most importantly, the records of attendance span years that are outside of the scope of evidence at issue in this case.  See supra Part III.B.4.  Further, the attendance records are primarily from the years 2005 and 2006, at which time the church tax inquiry was complete, and defendant had already issued its final adverse determination.  See supra Part I.B (finding that defendant issued its final adverse determination on June 8, 2004).  The attendance records are therefore unpersuasive regarding plaintiff's activities during the time period of defendant's audit.  Here, as in First Church of In Theo v. Commissioner (First Church of In Theo), plaintiff provided evidence that it has a regular congregation only after plaintiff has been put on notice regarding defendant's revocation of plaintiff's church status.  First Church of In Theo, 56 T.C.M. (CCH) 1045, 1049 (1989).  Accordingly, here, as in First Church of In Theo, the court views with skepticism plaintiff's evidence submitted only after plaintiff's status has been revoked.  See id. ("It was only after the second proposed adverse ruling detailing the IRS's criteria for qualification as a church that petitioner began to assert that it did in fact . . . hold regular religious services for a regular congregation . . . .").

statements as to which plaintiff responded that defendant had "'accurately quoted Roy [Masters's] comments:'"

> One of Roy's major doctrines is "You don't need a church." Roy provides meditation exercises so the individuals can commune with God individually . . . One of Roy's basic premises is "Catch and Release" – come to seminars, learn the Foundation's principles, and when you can do that, you don't need Roy.

Def.'s Facts ¶ 35; Pl.'s Resp. to Def.'s Facts 28 (citing Admin. Rec. 5326, 5889).

The case law consistently concludes that "[w]hen bringing people together for worship is only an incidental part of the activities of a religious organization, those limited activities are insufficient to label the entire organization a church." Foundation I, 88 T.C. at 1357 (citing De La Salle, 195 F. Supp. at 901, and Chapman, 48 T.C. at 364); see infra Part IV.B.2.n; Part IV.B.3. The evidence before this court contrasts with the Tax Court's finding in Foundation I that plaintiff held multiple services per week attended by a regular group of 50 to 350 congregants. Foundation I, 88 T.C. at 1360. Here, plaintiff's evidence is insufficient to prove that it has a regular congregation.

n.    Regular Religious Services [23]

---

[23] Defendant contends that there is an absence of evidence proving that the nature of plaintiff's services are religious. See, e.g., defendant's Reply for the United States in Support of Its Cross Motion for Summary Judgment and in Opposition to Plaintiff's Motion for Summary Judgment (defendant's Reply or Def.'s Reply) 19 ("[T]here is a dearth of evidence that [plaintiff's radio] broadcasts are religious."); Def.'s Mot. 37 ("[P]laintiff offers no evidence that . . . its weddings are conducted as those of a church would be . . . ."). The court disagrees and finds that defendant is asking the court to assume the question in issue: what a "church" wedding looks like. The evidence in the record is sufficient to support the conclusion that plaintiff, Foundation of Human Understanding (Foundation), holds religious meetings and that its founder, Roy Masters, disseminates a message based on plaintiff's principles and beliefs. See, e.g., Admin. Rec. Ex. 320B (compact discs containing recordings of Roy Masters's various radio broadcasts). Plaintiff describes the activities that take place during its Sunday meetings as follows:

> A typical service at the Tall Timber Ranch consists of a minister of the Foundation, most often Roy Masters, lecturing to a group of individuals from 10 to 30 in number concerning meditative practices, good and evil, Adam and Eve, societal hypnosis, man/woman relationships, alcoholism, child abuse and a wide

(continued...)

41

Plaintiff argues that it provides regular religious services in a variety of forms including Sunday meetings, weddings, seminars, and radio and internet broadcasts.  See Pl.'s Mem. 25; Pl.'s Reply 17-18.

Plaintiff's arguments suffer from two serious shortcomings.

First, its services in the form of Sunday meetings, weddings, and seminars, are not frequent enough to be characterized as "regular."  In Spiritual Outreach I, the Tax Court found that petitioner held a total of twenty religious gatherings during the two years at issue in the case.  Spiritual Outreach I, 1990 WL 3786, No. 23387-87X (Tax Court 1990), aff'd 927 F.2d 335 (8th Cir. 1991). Also during the two years at issue, petitioner held several retreats on the church grounds during which the participants practiced "meditation study and spiritual advancement."  Id.  A total of five wedding ceremonies were conducted in petitioner's chapel by ministers from guest churches.  Id.  The facts of this case are similar to Spiritual Outreach I.  Foundation's ministers have conducted nine weddings in the last ten years, three of which took place after 2000.  See Def.'s Facts ¶ 29; Pl.'s Resp. to Def.'s Facts 24.  "In 1998-2000, Plaintiff offered [twenty-one] seminars at a variety of locations, five of which were in Oregon."  Def.'s Facts ¶ 27; Pl.'s Resp. to Def.'s Facts 22.  In Spiritual Outreach I, the court was unpersuaded that "musical festivals and revivals . . . and gatherings for individual meditation and prayer by persons who do not regularly come together as a congregation for such purposes" was sufficient to satisfy the "cohesiveness factor which . . . is an essential ingredient of a 'church.'"  Spiritual Outreach I, 58 T.C.M. (CCH) at 1287.

Second, the court declines to characterize the radio and internet broadcasts as religious services.  The court's conclusion is consistent with the weight of persuasive case law.  At the time of the church tax inquiry, plaintiff owned "Talk Radio Network, which syndicates and distributes radio programming, including Roy Masters's show

_____

[23](...continued)
variety of other topical religious themes.  The minister in charge may feel inspired to perform ritual exorcisms for those individuals who are perceived by the minister to be possessed of evil influence.  The service/seminar might last from one hour to three hours per session.  A seminar is being held, for example, over Thanksgiving, 2001 at the ranch.  The seminars/services also take place in various cities according to the travel schedule of Roy Masters or the other Foundation ministers.

Def.'s Facts ¶ 19; Pl.'s Resp. to Def.'s Facts 15.  In addition, it is uncontested that plaintiff is a religious organization.  Def.'s Mot. 5 ("The Commissioner of Internal Revenue has ruled that [p]laintiff is a religious organization described in I.R.C. § 501(c)(3)").

'Advice Line.'"  Def.'s Facts ¶ 8; Pl.'s Resp. to Def.'s Facts 7.  "Plaintiff regularly broadcasts its 'Advice Line' radio call-in show on over 130 stations."  Def.'s Facts ¶ 8; Pl.'s Resp. to Def.'s Facts 7.  "Plaintiff broadcasts to the public over the internet, and its broadcasts are available to listeners worldwide."  Joint Stip. ¶ 26.  "Plaintiff broadcasts its message nightly, through a radio program in which Roy Masters and other of [p]laintiff's ministers speak and preach."  Joint Stip. ¶ 27.  In advocating that the court consider plaintiff's radio and internet broadcasts as religious services, plaintiff's chief argument is that radio broadcasts "allow individuals to attend meetings more regularly and conveniently."  Pl.'s Mem. 25.  Plaintiff advances a conception of religious services which includes radio and internet broadcasts "attended" by congregants either virtually, by using the internet, or by tuning in on a radio.  Id. at 27.  Plaintiff argues that its adherents "'assemble' to receive the spiritual message," id. at 28, and that its message is "no less heard by the congregation than [it] would be if [it] were delivered in a room with a pulpit," id. at 30.

The weight of persuasive authority, further discussed below, holds that radio and internet broadcasts lack critical associational aspects characteristic of religious services and are therefore instead properly regarded simply as broadcasting and publishing services insufficient to qualify a religious organization for church status.  See, e.g., Chapman, 48 T.C. at 367 (Tannenwald, J., concurring) ("The permissible purpose may be accomplished individually and privately in the sense that oral manifestation is not necessary, but it may not be accomplished in physical solitude."); see infra Part IV.B.2 (analyzing the application of the associational test to plaintiff, and discussing the various cases in which plaintiffs whose primary activities are broadcasting and publishing have not gained church status).

Moreover, plaintiff has not demonstrated that its radio and internet broadcasts accomplish the associational experience supplied by churches which people physically attend, thereby distinguishing itself from litigants in prior cases.  There is no evidence, for example, that plaintiff's adherents regard their experience while listening to plaintiff's broadcasts as a shared experience with other of plaintiff's followers, or as a communal experience in any way.  See Pl.'s Mem. passim; Pl.'s Reply passim.

Plaintiff has presented evidence that it meets some, but not all, of the fourteen criteria.  Therefore, here, as in Foundation I, viewed in light of the fourteen criteria alone, this case "presents a close question."  See Foundation I, 88 T.C. at 1361.  However, record evidence demonstrates that during the course of the church tax inquiry, plaintiff's activities no longer involved the associational characteristics which were critical to convincing the Tax Court to grant church status to Foundation in 1987.

43

Therefore, plaintiff's quest for qualification as a "church" described in § 170(b)(1)(A)(i) of the Code falters on the associational test.

2.      The Associational Test

To qualify as a church, "an organization must serve an associational role in accomplishing its religious purpose." Church of Eternal Life, 86 T.C. at 924. The associational test is a "threshold" standard which religious organizations must satisfy in order to obtain church status. Id. In creating the associational standard, the United States District Court for the District of Columbia stated that demonstrating associational aspects is the "minimum" requirement necessary for a religious organization to gain church status. American Guidance, 490 F. Supp. at 306.

During the tax years in question, Foundation's activities were similar to the activities of those plaintiffs whose suits for church status were unsuccessful primarily because their activities lacked the associational aspects which convinced the Tax Court to grant church status to Foundation in its prior declaratory judgment action. Foundation I, 88 T.C. at 1361 (finding the decision to grant church status to be a "close question"). Although not binding, the court finds persuasive the analysis of the Tax Court in Foundation I. In addition, subsequent Tax Court decisions which rely upon Foundation I clarify the factors which were critical to the court's decision in Foundation I.

In explaining its rejection of plaintiff's declaratory judgment action in VIA, the Tax Court summarized the key characteristics exhibited by plaintiff in Foundation I which were sufficient to support recognition of church status:  plaintiff conducted services "three to four times a week by ordained ministers for congregations of no less than 50 to 300 members[;] [Foundation] ministers were ordained only after having completed a three-year apprenticeship under the tutelage of [Foundation's] founder and leader[;] [and] Foundation operated a regular school for children in which the teaching of [Foundation] principles formed part of the curriculum." VIA, 68 T.C.M. (CCH) at 216 (describing plaintiff's characteristics essential to meeting the associational standard in Foundation I).  There is no evidence in the record presently before the court in this case to show that the distinguishing characteristics of plaintiff in Foundation I, as delineated by the Tax Court in VIA, continue to exist.  See supra Part IV.B.1.a-n.  In fact, the evidence before the court shows that plaintiff's primary activities are those which caused the most concern for the Tax Court in Foundation I and subsequent cases. In VIA, the resemblance between plaintiff in VIA and Foundation I which cut against the plaintiff in VIA was the plaintiff's use of the mass media and commercial activities. VIA, 68 T.C.M (CCH) at 216.  The court noted that Foundation's use of mass media and commercial activities in order to spread its beliefs, including radio broadcasts, a

magazine, and the sale of audio tapes and books, were "of concern" to the court in Foundation I. Id. It appears that the Tax Court decision relied on the fact that Foundation also exhibited "associational aspects" which were "much more than incidental" when the court recognized plaintiff in Foundation I as a church. Foundation I, 88 T.C. at 1361. The evidence now before the court presents a picture of Foundation that resembles the plaintiff in VIA much more closely than it resembles the plaintiff described in the court's findings in Foundation I. Plaintiff no longer provides religious services to an established congregation. See supra Part IV.B.1.m-n. Plaintiff's primary activities are internet and radio broadcasting, activities which are no longer supplemented by the associational activities in existence at the time of the Tax Court's decision in Foundation I. See supra Part IV.B.1.n (discussing the irregularity of plaintiff's Sunday meetings, seminars and weddings). The court in VIA stated that VIA, unlike plaintiff in Foundation I, exhibited a form of worship which was only incidental to petitioner's other activities, and was therefore insufficient to obtain church status. VIA, 68 T.C.M (CCH) at 216.

In Spiritual Outreach I, the Tax Court entertained a declaratory judgment action in which petitioner contested the IRS's initial determination that petitioner did not qualify as a church under I.R.C. §§ 509(a)(1) and 170(b)(1)(A)(i). Spiritual Outreach I, 58 T.C.M. (CCH) at 1284. The court held that petitioner failed to satisfy the associational test. Id. at 1287. In that case, petitioner maintained an outdoor amphitheater on its grounds at which petitioner held bimonthly musical programs. Id. at 1286. Petitioner held a total of twenty gatherings during the two years at issue in the case. Id. at 1287. The musical programs always included congregational singing, and opened and closed with a prayer facilitated by a minister. Id. Also during the two years at issue, petitioner held several retreats on the church grounds "wherein followers of different religions met for the purpose of meditation study and spiritual advancement." Id. A total of five wedding ceremonies were conducted in petitioner's chapel by ministers from guest churches. Id. The court was unpersuaded that "musical festivals and revivals . . . and gatherings for individual meditation and prayer by persons who do not regularly come together as a congregation for such purposes" was sufficient to satisfy the "cohesiveness factor which . . . is an essential ingredient of a 'church.'" Id. The court distinguished petitioner in Spiritual Outreach I from plaintiff in Foundation I, describing the associational factor as "critical." Id. The court stated that the presence of the associational factor in Foundation I was essential to resolving what was a "close question" in that case. Id. The record before the court describes an organization similar to the petitioner in Spiritual Outreach I, and is therefore similarly distinguishable from plaintiff's record presented in Foundation I. See supra Part IV.B.1.m-n.

In Church of Eternal Life, the court held that plaintiff failed the threshold associational test based on a finding that petitioner's principal activities included "the operation of a library containing about 4,000 items, bi-monthly meetings, the distribution of literature, the sale of merchandise and the publication of a newsletter." Church of Eternal Life, 86 T.C. at 921. Based on the court's factual findings in this opinion, Foundation is an institution that closely resembles the plaintiff in Church of Eternal Life. Foundation similarly fails to satisfy the associational standard. See supra Part IV.B.1.m-n.

Here, as in First Church of In Theo, plaintiff is a "self-described non-membership organization" whose "religious purposes were accomplished through the writing, publishing, and distribution of religious literature rather than through the regular assembly of a group of believers to worship together." First Church of In Theo, 56 T.C.M. (CCH) at 1049. In addition to failing to meet most of the fourteen criteria, the court in First Church of In Theo also concluded that plaintiff "fail[ed] to satisfy the threshold criteria of communal activity necessary for a church." Id. Accordingly, here, as in First Church of In Theo, the court finds that plaintiff is not a church within the meaning of § 170(b)(1)(A)(i) as interpreted by the weight of persuasive authority.

Because plaintiff no longer exhibits the associational characteristics which were critical to convincing the Tax Court to grant church status to Foundation in 1987, what may have been a "close question" on the facts before the court in Foundation I is more readily determinable in this case.[24]

---

[24] In response to the court's request for additional briefing in its May 18, 2009 Order, dkt. no. 72, Plaintiff's Supplemental Brief on Issues Raised by the Court (plaintiff's Supplemental Brief or Pl.'s Supp. Br.) urges that plaintiff's case is similar to the facts presented in Purnell v. Commissioner (Purnell), 63 T.C.M. (CCH) 3037 (1992), in which the religious organization discussed by the Tax Court was determined to satisfy the associational test. Pl.'s Supp. Br. 6-7. Purnell, however, is distinguishable from this case, both procedurally and substantively. First, as plaintiff acknowledges, Purnell was not a declaratory judgment case. Id. at 6; see Purnell, 63 T.C.M. (CCH) at 3037-2. In fact, the religious organization discussed in Purnell, the Kingdom of God Headquarters Church (Kingdom), was not a party to the action. Id. The central issue presented to the Tax Court in Purnell involved the deductibility of charitable contributions made by individuals to Kingdom. Id. Here, in contrast, the religious organization is the plaintiff bringing suit, and the central issue before this court is plaintiff's entitlement to a declaratory judgment based on its tax exempt classification. The facts in Purnell are distinguishable from plaintiff's facts in the present case. In Purnell, the court found that the religious organization satisfied the associational test after finding that Kingdom met several of the fourteen criteria, including having "both regular and irregular congregations" and conducting regular religious

(continued...)

The extent to which Foundation brings people together to worship is incidental to its main function which consists of a dissemination of its religious message through radio and internet broadcasts, coupled with written publications.  "When bringing people together for worship is only an incidental part of the activities of a religious organization, those limited activities are insufficient to label the entire organization a church."  See Foundation I, 88 T.C. at 1357.

V.    Conclusion

For the foregoing reasons, plaintiff's Motion is DENIED, and defendant's Motion is GRANTED.

The Clerk of Court shall ENTER JUDGMENT for defendant.  No costs.

IT IS SO ORDERED.

s/Emily C. Hewitt
EMILY C. HEWITT
Chief Judge

---

[24](...continued)
services.  Id. at 3037-4 (emphasis added).  In Purnell, the organization's activities in "various public spaces" at which the organization's founder preached "to anyone [who he could] interest in the message," led the Tax Court to describe the religious organization as a "church without walls."  Id. at 3037-3.  Plaintiff urges that Foundation is similarly a "church without walls."  Pl.'s Supp. Br. 7.  The activities described in Purnell, however, were undertaken by the organization in addition to the organization's regular religious services provided to its regular congregation.  Purnell, 63 T.C.M. (CCH) at 3037-3.  Evidence of plaintiff's radio ministry is insufficient to persuade the court to conclude that plaintiff is analogous to the religious organization discussed in Purnell and therefore satisfies the associational test.